699 A.2d 1170

**Wallace BALL**

v.

**STATE of Maryland.**

**No. 59, Sept. Term, 1996.**

Court of Appeals of Maryland.

Sept. 10, 1997.

160

Michael R. Braudes, Arthur A. DeLano, argued, Assistant Public Defenders (Stephen E. Harris, Public Defender, on brief), Baltimore, for Appellant.

Ann N. Bosse, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* RAKER and WILNER, JJ.

---

\* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, § 3A, he also participated in the decision and the adoption of this opinion.

CHASANOW, Judge.

This appeal is before the Court pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 414. The appellant, Wallace Dudley Ball, was tried by jury in the Circuit Court for Charles County, the Honorable Joseph S. Casula presiding, for the murder of Debra Anne Goodwich and related offenses. The jury found Appellant guilty of first degree premeditated murder, first degree felony murder, second degree murder, robbery with a dangerous or deadly weapon, robbery, daytime housebreaking, and use of a handgun in the commission of a felony. Appellant elected to be sentenced by the judge and received a sentence of death for the first degree murder conviction. With regard to the lesser offenses, Appellant was sentenced to a total of fifty years imprisonment.[1]

On this appeal of the imposition of the death penalty, Appellant presents eight issues for our review. In a somewhat different order from their presentation in Appellant's brief, they are:

(1) Whether the lower court erred in refusing to suppress Appellant's inculpatory statements to police.

(2) Whether the trial court erred in refusing to compel disclosure to the defense of a video tape shown, for the purpose of training, to trial judges who preside over capital trials.

(3) Whether the trial court erred in refusing to propound a jury instruction on the offense of theft.

(4) Whether the evidence was legally sufficient to sustain the conviction of robbery with a deadly weapon and the aggravating circumstance of murder in the course of a robbery.

(5) Whether the trial court erred in considering certain victim impact evidence at sentencing.

---

1. Appellant was sentenced to twenty years imprisonment for robbery with a deadly weapon, twenty years for use of a handgun in the commission of a crime of violence, and 10 years for daytime housebreaking.

(6) Whether the trial court erred in admitting at sentencing evidence of Appellant's prior convictions for nonviolent offenses, and of offenses not resulting in convictions.

(7) Whether the prosecution engaged in improper closing argument at sentencing.

(8) Whether Maryland's death penalty statute is unconstitutional.

Following a brief summary of the pertinent facts, we shall address the above issues, and their attendant sub-issues, *seriatim.*

## I. FACTUAL BACKGROUND

At approximately 3:45 p.m. on September 30, 1994, Arlene Goodwich arrived at her Baltimore County residence to find her house ransacked and her nineteen-year-old daughter, Debra Anne Goodwich, dead of numerous gunshot wounds. A subsequent autopsy report revealed that Debra had been shot six times in the torso and once in the arm. Police officers who were called to the scene found evidence of a forced entry through a rear window of the Goodwich home. They also discovered that the telephone line had been cut and the alarm system disabled. Debra Goodwich, it was later determined, had interrupted a burglary in progress.

Preliminary investigation of the crime led to the questioning of Appellant, Wallace Dudley Ball, at his home on October 12, 1994. The identification of Appellant as a potential suspect apparently resulted from the police learning that the victim's father, Walter Goodwich, was the former employer of Appellant's wife, Sharon Ball. Shortly before the murder of Debra Goodwich, Ms. Ball had terminated her employment with Walter Goodwich's firm in the wake of allegations that she had embezzled firm funds. Appellant informed Baltimore County police detectives at this initial meeting that he had done some roofing work at the Goodwich home and that he knew the victim. Six months later, a warrant was issued for Appellant's arrest.

Following his arrest in Knoxville, Tennessee, on April 27, 1995, Appellant was interviewed by Terry Clowers, an investigator in the Criminal Investigation Division of the Knoxville Police Department. Investigator Clowers testified that he informed Appellant that he would be audio taping the interview and that he advised Appellant of his *Miranda* rights. Appellant indicated that he understood his rights and elected to waive them.

Soon after the interview began, however, Appellant motioned to Investigator Clowers to turn off the tape recorder. Investigator Clowers complied with this request. According to Investigator Clowers, Appellant then stated that he would continue the discussion, but that he did not wish to talk on tape. The information that Appellant provided to Investigator Clowers at that point did not implicate him in the crime.

Upon learning of Appellant's arrest, Baltimore County police detectives Carroll Bollinger and William Cordwell proceeded to Knoxville and arranged to question Appellant. At the beginning of the interview, at which Investigator Clowers also was present, Detective Bollinger verified that Appellant had been advised of and understood his *Miranda* rights. Appellant indicated that, indeed, he knew his rights and that he was willing to talk to the detectives.

The detectives then asked Appellant to review two documents that had been prepared by Detective Bollinger prior to his arrival in Knoxville. One of the documents read as follows:

"ON SEPTEMBER 30, 1994, DEBBIE GOODWICH WAS BRUTALLY KILLED IN HER PARENT'S HOME.

WALLACE BALL

1.) IS A COLD BLOODED KILLER.

2.) HAS NO REGARD FOR HUMAN LIFE.

3.) KILLED DEBBIE GOODWICH FOR FUN.

4.) HAS BEEN LOOKING TO KILL SOMEONE FOR A LONG WHILE.

5.) WOULD KILL AGAIN BECAUSE HE LIKED IT.

6.) KILLED DEBBIE BECAUSE HE HATES WALTER GOODWICH."

In contrast, the other document stated:

"ON SEPTEMBER 20, 1994,[2] DEBBIE GOODWICH WAS ACCIDENTALLY KILLED IN HER PARENT'S HOME.

## WALLACE BALL

1.) HAS HAD A TOUGH LIFE.

2.) LOVES HIS SON, DILLON.

3.) KILLED DEBBIE GOODWICH BECAUSE HE WAS AFRAID SHE COULD IDENTIFY HIM.

4.) WAS TRYING TO SUPPORT HIS FAMILY WHICH IS WHY HE BROKE INTO THE GOODWICH HOME.

5.) UNFORTUNATELY BECAME HOOKED ON DRUGS.

6.) WALTER GOODWICH WAS AN UNREASONABLE MAN IN DEALING WITH WALLACE AND SHARON BALL.

7.) IS SORRY IN HIS HEART FOR KILLING DEBBIE GOODWICH.

8.) WISHES HE COULD CHANGE WHAT HAPPENED TO DEBBIE.

9.) DEBBIE STRUGGLED WITH HIM CAUSING HIM TO SHOOT HER WHICH HE DIDN'T WANT TO DO."

Detective Bollinger testified that, after Appellant read the documents, "[h]e placed them back on the table and he asked what do they do for me." Detective Bollinger explained to Appellant that they were two different ways of characterizing him. Soon thereafter, sensing that Appellant was uncomforta-

---

**2.** The reference to September 20, as opposed to September 30, appears to have been a typographical error.

ble with the presence of 3 police officers, Detective Bollinger asked Detective Cordwell and Investigator Clowers to leave the room.

After some discussion, Appellant confessed to Detective Bollinger that he had killed Debra Goodwich. The particulars of the oral confession were described by Detective Bollinger at a pre-trial hearing as follows:

"[BOLLINGER]: [Appellant] stated he had gone to the Goodwich residence the night before the burglary occurred and the homicide occurred, that he waited outside. Waited outside on the property, waited there all night long. Waited until the morning hours to see the residents leave.... At that point he felt it was safe to enter the residence, he broke in the residence.

Q: Did he do anything to disable anything?

[BOLLINGER]: Yes, Ma'am. Before entering the residence he cut the alarm wires and the phone wires for the residence. They had a security system, an alarm system. He cut those wires. He also cut the phone lines to the residence.

Q: And did he do anything while he waited outside all night?

[BOLLINGER]: Yes Ma'am. As he sat there and waited he had brought food along and he was eating barbecue chicken wings outside the residence, all night long.

Q: So after he cut the phone and burglar alarm wires how did he break in the house?

[BOLLINGER]: Through a basement window. * * * Once inside he wanted to make it look as if an amateur had committed the offense so he went into the kitchen area and dumped [a] household product like sugar on the ... floor to make it look like it was a juvenile committing the offense.

He even wore a pair of boots, roofer[']s boots that were larger in size than his actual foot. He did this because he had told me that once the burglary had been committed he thought the Goodwich[e]s would immediately assume that he was the one responsible....

Q: While he was burglarizing the home did he tell you there was a time somebody came home?

[BOLLINGER]: Yes, Ma'am, he said he heard someone state who is in here and at that point—

Q: Where was he at that time?

[BOLLINGER]: He was in the back bedroom I believe, master bedroom.

Q: And what did he hear?

[BOLLINGER]: His exact words to me, who is in here.

Q: What did he say next?

[BOLLINGER]: Stated that he moved toward the door, the front door and as he moved toward the front door the victim, Debra Goodwich, came around the corner and they almost bumped into each other. At that point he was startled, she was startled. At that point he shot her. He shot her a total of 6 times."

Appellant also told the detective that after he shot Debra Goodwich, he remained inside the Goodwich residence, collecting his thoughts, for approximately thirty minutes. He then fled the scene in the victim's car. Later, Appellant tossed incriminating evidence, consisting of jewelry, a pocket book, a gun, and a pair of boots, into Liberty Reservoir. These items and Debra Goodwich's vehicle eventually were recovered by police during the course of their investigation.

After Appellant orally confessed to the crimes, Detective Bollinger asked him if he would like to write a letter to the Goodwich family, explaining the events that had occurred. Apparently recognizing that such a letter would amount to a written confession, Appellant initially resisted. Detective Bollinger described the exchange as follows:

"Q: Did you give [Wallace Ball] an opportunity to give a statement in writing?

[BOLLINGER]: Yes, ma'am, I did.

Q: How did you do that?

[BOLLINGER]: We went back and forth and Wallace advised that he did not want to put it on paper. At that

point I explained to him, I said Wallace at that point when this comes to trial, when this all comes to trial if you don't put it on paper then it is going to be me up on the stand telling the jury what occurred. It is going to be through you to me to the jury. I said it is much better if you told the story, not that it would get distorted through me to the jury, that it is your words, not mine, it is—I don't want to miscommunicate anything, I don't want to misrepresent anything, that it should be you telling the jury what occurred on that day. That is why I am here, I am here to find out the why for you to tell the people, tell everybody the why.

Q: What did the defendant say in response to that?

[BOLLINGER]: He stated I like that. And he said give me those papers. I am going to convict myself."

Appellant thereupon confessed in writing to the murder of Debra Goodwich. Prior to trial, Appellant sought, unsuccessfully, to suppress the oral and written inculpatory statements. The propriety of the court's refusal to grant the motion to suppress is at issue in this appeal and will be developed in further detail below.

Appellant's trial by jury resulted in a verdict of guilty on, *inter alia,* the first degree murder charge. As authorized by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413(b)(3), Appellant elected to be sentenced by the judge, rather than the jury. At the sentencing hearing, the State introduced the mandatory pre-sentence investigation report, certified copies of court documents that evidenced Appellant's prior convictions, and the victim impact testimony of the victim's mother, Arlene Goodwich. Defense counsel, in turn, elicited testimony from Appellant's wife, Appellant's mother, and licensed social worker Hans Selvog. The testimony of the defense witnesses appears to have been aimed, in part, at establishing that Appellant was emotionally disturbed from a young age and that he had no prior convictions for crimes of violence. Toward this end, Mr. Selvog prepared a social history of Appellant, which included information concerning Appellant's previous convictions for drug-related and motor vehicle offenses, as

well as various burglary and theft offenses. Based on the evidence presented at trial and at sentencing, the judge found as an aggravating circumstance that the murder was committed during the course of a robbery. As a mitigating circumstance, the judge found that Appellant had no prior convictions for crimes of violence. In addition, the judge stated:

"I find by the preponderance of the evidence that the following additional mitigating factors exist:

That the defendant's confession, his unstable childhood, his prior institutional history and adjustment to prison life—and I also considered mercy."

Concluding that the aggravating circumstances outweighed the mitigating circumstances, the judge imposed a sentence of death, which Appellant now asks this Court to review.

Additional facts relevant to the disposition of this appeal will be provided as needed throughout this opinion.

## II. ANALYSIS

### A. Appellant's Inculpatory Statements to Police

The first issue that we shall address is whether the trial court erred in denying Appellant's pre-trial motion to suppress the inculpatory statements that Appellant made to Detective Bollinger. The essence of Appellant's argument is that the oral and written confessions were not freely and voluntarily given. He also asserts, as an additional basis for suppression, that there was conflicting evidence as to whether Appellant invoked his right to remain silent during the initial interview conducted by Investigator Clowers and that the hearing judge erred in failing to articulate findings of fact that resolved this conflict. We find no merit in these various contentions.

1.

We shall begin with the issue of the voluntariness of Appellant's confessions to Detective Bollinger. The introduction of a confession as evidence against the accused at trial is permitted only where it is determined that the confession was " '(1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth

Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda.*'" *Hof v. State,* 337 Md. 581, 597–98, 655 A.2d 370, 378 (1995) (quoting *Hoey v. State,* 311 Md. 473, 480, 536 A.2d 622, 625 (1988)). In this appeal, Appellant relies primarily on State common law grounds for asserting that his confessions were not freely and voluntarily given. Specifically, Appellant contends that the confessions were induced by improper promises, threats, and psychological coercion. *See Hoey,* 311 Md. at 483, 536 A.2d at 627 (stating that confessions that are "induced by force, undue influence, improper promises, or threats" may not be used as evidence against the accused).

a.

Appellant first finds fault with the manner in which Detective Bollinger responded to Appellant's initial resistance to provide a written confession via a letter of explanation to the Goodwich family. Detective Bollinger testified that he told Appellant that it would be

> "much better if you told the story, not that it would get distorted through me to the jury, that it is your words, not mine, it is—I don't want to miscommunicate anything, I don't want to misrepresent anything, that it should be you telling the jury what occurred on that day."

Appellant asserts that the court's admission of a confession made in light of the assurance that it would be "much better if you told the story" runs afoul of the well-established principle of Maryland law that

> "if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible."

*Hillard v. State,* 286 Md. 145, 153, 406 A.2d 415, 420 (1979).

The rule against the inducement of confessions through the promise of some benefit has been repeated by Maryland

courts on numerous occasions. *See, e.g., Reynolds v. State,* 327 Md. 494, 505, 610 A.2d 782, 787 (1992) (observing that "[c]ourts abhor, or at least find distasteful, promises of leniency or immunity made by state agents to defendants subject to the vulnerability of custodial interrogation"), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993); *State v. Kidd,* 281 Md. 32, 35–36, 375 A.2d 1105, 1108 (explaining that "[f]or a statement to be the free and voluntary act of an accused, it must be obtained without ... hope held out or promise made on the part of the authorities"), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977); *Kier v. State,* 213 Md. 556, 561, 132 A.2d 494, 497 (1957) (stating that "[t]he State must show ... that no hope or promise was held out to the accused for the purpose of inducing him to confess"); *James v. State,* 193 Md. 31, 41–42, 65 A.2d 888, 892 (1949) (defining voluntary confession as "not obtained by fear of prejudice or hope of advantage").

The historical justification for excluding confessions made in reliance on a promise of some benefit is that they are, of course, inherently untrustworthy. DAVID M. NISSMAN AND ED HAGEN, LAW OF CONFESSIONS § 2:2, at 2–3 (2d ed. 1994). Examples of specific types of promises that have rendered subsequent confessions inadmissible in Maryland courts include: a promise that the suspect's wife would not be arrested, *Stokes v. State,* 289 Md. 155, 160, 423 A.2d 552, 554 (1980); a detective's assurance that he would "go to bat" for the suspect, *Hillard,* 286 Md. at 153, 406 A.2d at 420; and an official's statement that " 'it would be better for [the suspect] to tell the truth, *and have no more trouble about it.'* " *Biscoe v. State,* 67 Md. 6, 7, 8 A. 571, 572 (1887) (emphasis added).

Notwithstanding the prohibition against the inducement of confessions by improper promises or other forms of coercion, it has been held that an officer's mere admonition to the suspect to speak the truth does not render a statement involuntary. *Reynolds,* 327 Md. at 507, 610 A.2d at 788 (citing *Ralph v. State,* 226 Md. 480, 486, 174 A.2d 163, 166 (1961), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962); *State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244, 247 (1990)). The

following exhortations by interrogating officers, for example, all have been held to be proper: " 'I want you to tell me the truth,'" *Nicholson v. State,* 38 Md. 140, 153 (1873); " 'the truth would hurt no one,'" *Deems v. State,* 127 Md. 624, 630, 96 A. 878, 880 (1916); " 'get it off [your] chest,'" *Bean v. State,* 234 Md. 432, 442, 199 A.2d 773, 777–78 (1964); and there's " 'no sense in lying,'" *Clark v. State,* 48 Md.App. 637, 646, 429 A.2d 287, 292 (1981).

█ The issue is whether Detective Bollinger's statement that it would be "better" for Appellant to tell the story in his own words falls within the former category of improper inducement. The context in which this suggestion was made clearly indicates that it does not. Detective Bollinger was not suggesting to Appellant that the police or any other State official would confer any special benefit or advantage on Appellant in exchange for a written confession. Rather, the message that Detective Bollinger was trying to convey when he stated that it would be "better" for Appellant was simply that a written confession would provide Appellant an opportunity to explain his criminal behavior in his own words. To the extent that this opportunity constituted a "benefit" to Appellant, it did not rise to the level of an improper inducement. That Appellant was aware that no other benefit was to be realized from providing a written confession is evidenced, in fact, by his remark to Detective Bollinger that "I am going to convict myself."

b.

█ Appellant also claims that his written confession was coerced in that Detective Bollinger implied that if Appellant failed to provide a written statement, the jury would hear a distorted version of Appellant's oral confession. In support of his position, Appellant cites *Watts v. The State,* 99 Md. 30, 35, 57 A. 542, 544 (1904), a case in which a newspaper reporter told an arrestee, in the presence of police officials, that " 'it would be possibly better for him if he would make a clean statement, so it would not appear erroneously in the papers; that the papers would get it anyway, and as my paper was an

evening paper, the correct statement would come out first.' "
Although the *Watts* Court held that a confession thereafter
obtained was inadmissible, there were other circumstances
surrounding the confession that make *Watts* inapposite to the
present case.

First, the Court noted in *Watts* that the newspaper reporter
"frankly admitted that he found the defendant shortly after
the tragedy, on the same day, in a nervous and depressed
condition, covered with blood from a wound on the side of his
head . . . and apparently suffering from shock; and that he
told [the defendant] 'it would possibly be to his advantage' " to
give his version of the events that had transpired. *Watts,* 99
Md. at 36, 57 A. at 545. The defendant's poor physical
condition apparently was a factor, not present in the instant
case, in the Court's ruling that the confession should have
been suppressed. *Id.* Furthermore, the defendant in *Watts,*
unlike Appellant, had not confessed verbally to the crime of
which he was suspected prior to the statements of the newspa-
per reporter.

Rather than the newspaper reporter in *Watts,* therefore, the
conduct of Detective Bollinger is more closely akin to that of
the interrogating detective in *Hoey, supra.* In *Hoey,* the
detective suggested to the suspect, after the suspect had
orally confessed, that he reduce the confession to writing "to
ensure that there would not be a disagreement later as to
what [he] actually admitted." 311 Md. at 484, 536 A.2d at 627.
The suspect gave a written confession. *Hoey,* 311 Md. at 478,
536 A.2d at 624. On appeal, the suspect argued that the
detective's suggestion was improper. *Hoey,* 311 Md. at 480,
536 A.2d at 625. This Court upheld the trial court's determi-
nation that the confession was freely and voluntarily given and
found no error, under Maryland non-constitutional law, in the
admission of the confession at trial. *Hoey,* 311 Md. at 484, 536
A.2d at 627. In assessing the voluntariness of the confession
under constitutional standards, the Court further character-
ized the detective's conduct as follows:

"We find this action to be innocuous. Even considering [the
suspect]'s mental impairment, [the detective]'s action cannot

be deemed coercive. Rather, his action can only be viewed as neutral, if not helpful, to [the suspect]. [The suspect] had already orally confessed when [the detective] suggested reducing his confession to writing, and [the detective] merely sought to protect himself and [the suspect] from the conflicts that often arise when oral statements are the only evidence of an occurrence. Consequently, we find that [the detective]'s actions were not 'so offensive to a civilized system of justice that they must be condemned.' "

*Hoey,* 311 Md. at 486, 536 A.2d at 628. We adopt the same view of Detective Bollinger's statement in the present case. Detective Bollinger's suggestion that Appellant reduce his confession to writing in order to tell the story "in his own words" can be interpreted as a neutral attempt to avoid later disagreement as to the particulars of Appellant's oral confession. It did not overbear Appellant's free will and does not render the subsequent written confession involuntary.

### c.

Appellant also assails the method of interrogation employed by Detective Bollinger, whereby the detective presented Appellant with two contrasting descriptions of Appellant and the murder of Debra Goodwich. Characterizing this interrogation technique as a "classic example" of psychological coercion, Appellant claims his subsequent statements were involuntary.

A confession clearly is not voluntary if it is the product of physical or psychological coercion. *Vines v. State,* 285 Md. 369, 379, 402 A.2d 900, 905 (1979); *Kidd,* 281 Md. at 36, 375 A.2d at 1108; *Abbott v. State,* 231 Md. 462, 465, 190 A.2d 797, 799 (1963); *James,* 193 Md. at 41–43, 65 A.2d at 892. A person who has committed an illegal act, however, is not always eager to admit his or her wrongdoing. Police officers, charged with investigating crimes and bringing perpetrators to justice, are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime. As the Court of Special Appeals has observed, "[d]eception short of an overbearing inducement is a 'valid weapon of the police arsenal.' " *Rowe v. State,* 41

Md.App. 641, 645, 398 A.2d 485, 488 (1979) (quoting *Hopkins v. State,* 19 Md.App. 414, 424, 311 A.2d 483, 489 (1973), *cert. denied,* 271 Md. 738 (1974)). Similarly, an appeal to "[t]he inner psychological pressure of conscience to tell the truth does not constitute coercion in the legal sense." *Kier,* 213 Md. at 562, 132 A.2d at 498. It is only where police conduct " 'overbear[s the accused's] will to resist and bring[s] about confessions not freely self-determined . . . .' " that the confession will be suppressed. *Rowe,* 41 Md.App. at 645, 398 A.2d at 488 (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760, 768 (1961)). Simply stated, police officers are not permitted to employ coercive tactics in order to compel an individual to confess, but they are permitted to "trick" the suspect into making an inculpatory statement. *State v. Carrillo,* 156 Ariz. 125, 750 P.2d 883, 894 (1988) (observing that "[t]he police are not forbidden to outsmart— they are forbidden to compel").

The decision in *Rowe, supra,* illustrates this principle. The Court of Special Appeals held in *Rowe* that the police did not improperly induce the appellant to confess where the interrogating officer feigned loathing of the victim and admiration for the perpetrator. The officer stated that he wanted to shake the hand of the person who killed the victim; in response, the appellant offered the officer his hand. *Rowe,* 41 Md.App. at 644, 398 A.2d at 488. Holding that the officer's deception did not amount to an overbearing inducement, the court explained:

> "[t]he words used . . . are certainly not such as to automatically render that which follows inadmissible. It is barely conceivable that *anyone* could have interpreted the officer's comment as anything more than an effort to 'soft soap' the appellant. . . ." (Emphasis in original).

*Rowe,* 41 Md.App. at 645, 398 A.2d at 488.

The court reached a similar conclusion in *Fuget v. State,* 70 Md.App. 643, 651, 522 A.2d 1371, 1375 (1987), where the appellant complained that he was deceived by the interrogating officer's smile, "coddling words," and "sympathetic sounds." The court acknowledged that although this interro-

gation technique was "somewhat unique," it did not "*coerce* [ ] the appellant into making an incriminating statement." *Fuget,* 70 Md.App. at 652, 522 A.2d at 1375. (Emphasis added).

■ The same reasoning applies to the interrogation technique employed by Detective Bollinger in the case *sub judice.* There is no indication that Appellant's will was overborne by the use of this interrogation method. Nor does the record support Appellant's assertion that the police took advantage of Appellant's ignorance that the two different scenarios both amounted to first degree murder. Detective Bollinger testified that after Appellant read the two documents, he asked "what do they do for me." Appellant apparently recognized, therefore, that under either scenario he would be admitting to the murder of Debra Goodwich. We find no merit in Appellant's contention that this interrogation technique rendered his subsequent statements involuntary.

### 2.

Appellant also asserts reversible error in the alleged failure of the lower court, in ruling on the admissibility of Appellant's extrajudicial confession, to make factual findings as to whether Appellant invoked his right to remain silent during the initial interview conducted by Investigator Clowers.

■ This Court has indeed emphasized that in ruling on a motion to suppress "the trial court [must] ma[ke] the necessary factual findings to support its conclusion that the waiver [of constitutional rights] was valid and the statement properly admissible in evidence." *McIntyre v. State,* 309 Md. 607, 623, 526 A.2d 30, 38 (1987). If there is no conflict in the evidence with respect to the circumstances under which the statement was made, however, there is no need for articulated factual conclusions. *See Gilliam v. State,* 320 Md. 637, 648, 579 A.2d 744, 749 (1990) (holding articulated factual determinations unnecessary where, at the suppression hearing, the facts presented were undisputed and the defendant did not raise a challenge), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).

■ The conflict in evidence that Appellant perceives is the manner in which Investigator Clowers concluded the aborted tape recording of his interview of Appellant, as evidenced by a written transcript of the recording, and the testimony of Investigator Clowers at the suppression hearing. The final passage of the transcript reads as follows:

"This is going to conclude the interview with Wallace Dudley Ball. *Refused to answer any questions.* Subject did not request an attorney . . ., just *refused to answer any questions.* We just talked a little bit about his past . . ., the supposed murder. [H]e advised me that . . . he didn't do it, that . . . his girlfriend did it and then they pinned it on him and he left Baltimore." (Emphasis added).

Appellant asserts that this transcript indicates that Appellant invoked his right to remain silent, which Investigator Clowers then failed to honor. Investigator Clowers testified at the suppression hearing, however, that Appellant "did not want to talk on tape," but that he was otherwise willing to continue the discussion. He further explained that the notation on the tape that Appellant "refused to answer any questions" was intended to mean that Appellant refused to answer any questions *on tape.* The validity of this explanation was bolstered by the introduction of a handwritten summary of the off-tape conversation with Appellant, prepared by Investigator Clowers shortly after the conclusion of the interview, that begins with the statement that Appellant "would not talk on tape. . . ." Appellant did not testify to the contrary at the suppression hearing.

To the extent that the documentary evidence generated a "dispute" as to whether Appellant invoked his right to remain silent, therefore, Investigator Clowers, the only witness to testify on the issue, resolved the conflict by explaining that Appellant only refused to answer questions on tape. Investigator Clowers' testimony at the hearing, therefore, clarified Investigator Clowers' statements on the audio tape. Under these circumstances, we find no error in the judge's failure to articulate that he found that Appellant had not invoked his

right to remain silent. This finding was implicit in the judge's ruling.

## B. The Judicial Institute Video Tapes

The second issue concerns certain Maryland Judicial Institute video tapes and accompanying materials that are used to train judges who preside over capital cases. Prior to trial, defense counsel sought a court order, pursuant to Maryland Rule 4–264, directing that these materials be turned over to the defense for inspection. The reason proffered by counsel for this unusual request was that review of the materials was necessary "to ensure that these materials do not contain any directives, guidelines, protocols, models, procedures, and/or statements of policy to the trial court regarding rulings on discretionary matters which might unduly prejudice the defendant and/or operate to his detriment in any way...." Appellant contends that the lower court erred in denying this motion.

Appellant's asserted right to review these tapes is based, in part, on *Bartholomey v. State*, 267 Md. 175, 193 n. 13, 297 A.2d 696, 706 n. 13 (1972), in which this Court observed:

"Any information which might influence the judgment of the sentencing judge, not received from the defendant himself, or given in his presence, should (without necessarily disclosing its source) be called to the defendant's attention so as to afford him an opportunity to refute or discredit it." (Citations omitted).

Appellant argues that because these tapes might have influenced the sentencing judge, they should have been disclosed. Appellant's position suffers, however, from a fatal flaw: the sentencing judge in this case had never seen the subject video tapes. In response to defense counsel's request for access to the video tapes, Judge Casula clearly stated that the video tapes were not presented at the training program that he attended:

"[DEFENSE COUNSEL]: * * * I would like the record to reflect my continuing request to see the tapes on the death penalty training.

THE COURT: Your purpose?

[DEFENSE COUNSEL]: To be updated on the most current state of the law and ascertain there is no prejudice towards my client in the information given out by the judicial institute to the judges specifically in this case.

THE COURT: I understand. I did not attend the one—the one I attended was 1992 and 1991, whatever it was, 1993, 1992, I believe, which I understand they have changed considerably since then because *I did not have a video tape.*" (Emphasis added).

Judge Casula could not have been influenced by video tapes that he had not seen. There was no error, therefore, in denying Appellant's request for access to these tapes. In fact, there would be no error in the denial of Appellant's request even if Judge Casula had seen the subject video tapes. The discovery of Judicial Institute training tapes is neither permitted under the Maryland rules, nor "mandated by constitutional guarantees." *See Goldsmith v. State,* 337 Md. 112, 122, 651 A.2d 866, 871 (1995) (stating that "the right to pre-trial discovery is strictly limited to that which is permitted by statute or court rule or mandated by constitutional guarantees").

 Maryland Rule 4–264 provides:

"On motion of a party, the circuit court may order the issuance of a subpoena commanding a person to produce for inspection and copying at a specified time and place before trial designated documents, recordings, photographs, or other tangible things, not privileged, *which may constitute or contain evidence relevant to the action.*" (Emphasis added).

A general training video on the conduct of capital cases does not "constitute or contain evidence relevant to the action." The circuit court, therefore, has no authority to order the third-party custodian of these video tapes to turn them over to

the accused in a criminal action. Furthermore, to the extent that there exists a constitutional right to pre-trial discovery of certain information, recognition of that right generally has been based on the notion that the accused in a criminal proceeding is entitled to access to *exculpatory* information, *see Pennsylvania v. Ritchie*, 480 U.S. 39, 58, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40, 58 (1987), or to information *about the accused* upon which the judge or jury relies in imposing a particular sentence, *see Driver v. State*, 201 Md. 25, 31–32, 92 A.2d 570, 573 (1952) (Chief Medical Officer's report about accused). The Judicial Institute video tapes provide no such information and do not give rise to due process concerns. For these reasons, discovery of the video tapes need not be allowed. To conclude otherwise would be to authorize, in effect, discovery of all materials associated with any continuing legal education course, seminar, or training program that a judge has ever attended.

### C. The Conviction of Robbery with a Deadly Weapon and Robbery as an Aggravating Circumstance of Murder

The next issue concerns the validity of the jury's conclusion at trial, and the judge's conclusion at sentencing, that Appellant committed the offense of robbery. Robbery has been defined by this Court as "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence or putting in fear, or, more succinctly, as larceny from the person, accompanied by violence or putting in fear." *West v. State*, 312 Md. 197, 202, 539 A.2d 231, 233 (1988) (citations omitted). Invoking this common law definition, Appellant argues that the evidence was insufficient to support a finding of robbery in that: (1) the asportation of the property occurred before [Appellant] used force against the victim; and (2) "the property was not taken from the person or in the presence of [Debra] Goodwich." We find no merit in these contentions.

We begin with Appellant's assertion that the element of force necessary to support a robbery conviction is only force

that precedes, or is precisely contemporaneous with, the physical "taking" of the property. Appellant contends that he did not commit a robbery because he murdered Debra Goodwich *after* he had already seized the jewelry and other items from the master bedroom; that is to say, he did not use force to accomplish the initial "taking."

Under Appellant's theory, guilt must be assessed as of the exact point in time at which asportation of the property occurs, without regard to any events thereafter. If force is used during the thief's escape from the scene of the taking or in an effort to retain possession of property already taken, Appellant contends that there has been no robbery.

 Historically, there has been some disagreement among the various jurisdictions as to whether the use of force to retain property or to effectuate an escape supplies the requisite element of robbery, as the offense is defined at common law. *See* Kristine Cordier Karnezis, Annotation, *Use of Force or Intimidation in Retaining Property or in Attempting to Escape, Rather Than in Taking Property, as Element of Robbery,* 93 A.L.R.3d 643 (1979). Some courts, adhering to the approach suggested by Appellant, have refused to uphold robbery convictions where force was applied subsequent to the physical act of "taking." *See, e.g., Royal v. State,* 490 So.2d 44, 46 (Fla.1986) (holding that robbery convictions were improper where force was not used "prior to or while taking" the property) [3]; *State v. Aldershof,* 220 Kan. 798, 556 P.2d 371, 375 (1976) (stating that "robbery is not committed where the thief has gained peaceable possession of the property and uses no violence except to resist arrest or to effect his escape"). Other courts, in contrast, have interpreted robbery as a continuous transaction that is not complete until the perpetrator reaches a place of temporary safety.

---

3. *Royal v. State* has since been superseded by statute, as stated in *State v. Baker,* 540 So.2d 847, 848 (Fla.Dist.Ct.App.1989) (commenting that amendment to robbery statute provides that "the force used in the course of taking property may be subsequent to the taking if the force and the act of taking 'constitute a continuous series of acts or events' ").

*See, e.g., People v. Estes,* 147 Cal.App.3d 23, 194 Cal.Rptr. 909, 912 (1983); *People v. Turner,* 120 Mich.App. 23, 328 N.W.2d 5, 7 (1982). Under this latter theory, the offense of robbery occurs whenever force is used in furtherance of the "taking," regardless of whether force is used to gain original possession of the property, or to retain possession in the face of subsequent resistance from the victim.

In *Estes, supra,* for example, the court held that a robbery had occurred where the defendant used force to prevent a security guard from retaking property that the defendant had stolen from a department store. The security guard had witnessed the defendant steal the items and confronted him in the store parking lot. In resisting the guard's attempt to detain him, the defendant threatened the guard with a knife, and the guard retreated. *Estes,* 194 Cal.Rptr. at 910. The court held that evidence of these facts was sufficient to support a robbery conviction in that:

> "[t]he crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety. It is sufficient to support the conviction that appellant used force to prevent the guard from retaking the property and to facilitate his escape. The crime is not divisible into a series of separate acts. Defendant's guilt is not to be weighed at each step of the robbery as it unfolds. The events constituting the crime of robbery, although they may extend over large distances and take some time to complete, are linked by a single-mindedness of purpose."

*Estes,* 194 Cal.Rptr. at 912.

The Court of Appeals of Michigan reached a similar conclusion in *People v. Tinsley,* 176 Mich.App. 119, 439 N.W.2d 313 (1989), where the robbery conviction was predicated on a threat of force during the defendant's flight from the scene of the "taking." In this case, the taking occurred when the accused snatched money from a store counter and fled. The customer, who had placed the money upon the counter, and his son gave chase. The pursuit continued until the victim's

son came within approximately nine feet of the accused, at which point the accused drew a gun. The victim and his son abandoned their pursuit upon this show of force. *Tinsley,* 439 N.W.2d at 314. In upholding a conviction of armed robbery on these facts, the court referred to robbery as a "continuous offense, which is not complete until the perpetrator reaches a place of temporary safety," and explained that "the use of force or intimidation in retaining the property taken or in attempting to escape rather than in taking the property itself is sufficient to supply the element of force or coercion essential to the offense of robbery." *Tinsley,* 439 N.W.2d at 314 (citations omitted).

The Court of Special Appeals expressed approval of the "continuous offense" approach in upholding a robbery conviction in *Burko v. State,* 19 Md.App. 645, 657–58, 313 A.2d 864, 871 (1974), *vacated on other grounds,* 422 U.S. 1003, 95 S.Ct. 2624, 45 L.Ed.2d 667 (1975). The appellant in *Burko* appealed his conviction for armed robbery of a shoe store on the ground that he did not draw his gun until after the taking of the money had been accomplished. Although the court primarily relied upon witness testimony that the gun was in plain view prior to the taking, its rejection of the appellant's claim was also based, in part, on precedent to the effect that "when one commits a larceny and then displays a weapon so as to overcome the resistance of the witness, the crime is then elevated to robbery. *See* Clark and Marshall, *A Treatise on the Law of Crimes,* § 12.09 (6th ed. Wingersky rev. 1958)." *Id.* The *Burko* decision has been interpreted as implicitly overruling earlier case law in Maryland, at the intermediate appellate court level,[4] that the use of force to prevent an immediate retaking of the property does not constitute robbery. Kristine Cordier Karnezis, Annotation, *Use of Force or Intimidation in Retaining Property or in Attempting to*

---

4. In *Gray v. State,* 10 Md.App. 478, 481, 271 A.2d 390, 393 (1970), the Court of Special Appeals stated: "[I]f subsequent to the larceny the owner should come upon the thief and be prevented from retaking his property by violence, the thief would be guilty of larceny and assault, but not robbery."

*Escape, Rather Than in Taking Property, as Element of Robbery,* 93 A.L.R.3d 643, 650 (1979).

Another suggested justification for the "continuous offense" approach is that when a thief must use force to retain possession of the property, the thief does not acquire full possession of the property until the force or threat of force overcomes the custodian's resistance to the taking. *See* WHARTON'S CRIMINAL LAW § 463, at 39–40 (15th ed. 1996). Stated in other words, a "taking" does not occur until the perpetrator has neutralized any immediate interference with his or her possession. *Id.* The point of asportation thus is not absolutely determinative. This does not mean, of course, that a thief cannot be convicted of robbery unless and until resistance to possession has been overcome and the thief has reached temporary safety. "On the one hand, a criminal is guilty of a completed robbery and not merely of an attempt if he moves the stolen goods a short distance. On the other hand, the crime is continuous and not completed until the parties have reached temporary safety." *Turner,* 328 N.W.2d at 7 (citation omitted).

We agree that the better view is that the use of force during the course of a larceny in order to take the property away from the custodian supplies the element of force necessary to sustain a robbery conviction. The mere fact that some asportation has occurred before the use of force does not mean that the perpetrator is thereafter not guilty of the offense of robbery. Rather, the totality of the circumstances that surround the taking must be considered. If, as in the instant case, the use of force enables the accused to retain possession of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery.

Applying these principles to the facts of this case, we hold that Appellant's use of force against Debra Goodwich satisfied the "force" element of robbery. Debra Goodwich presumably sought to prevent Appellant from removing the items of personal property from her parents' home. In using force to prevent immediate interference with his possession of the property, therefore, Appellant committed the crime of

robbery. From this conclusion, it follows that the property was taken from Debra Goodwich's person or presence, as required under the common law definition of robbery. The law is settled that the victim of a robbery need not be in the same room of the dwelling from which property is taken in order for the "person or presence" element of robbery to be satisfied. *See State v. Colvin,* 314 Md. 1, 19–20, 548 A.2d 506, 515 (1988) (finding that robbery had been committed in victim's presence where the victim was stabbed in different room of the house from which the property was taken). Moreover, it should be noted that Appellant was indicted not only for robbery with regard to the jewelry and other items, but also with regard to Debra Goodwich's 1988 Honda Accord. Appellant stole the vehicle after he murdered Debra Goodwich and as she lay dead in the foyer of the Goodwich home. Even if we had concluded that the elements of armed robbery were not satisfied with respect to the other items, Appellant was at least guilty of armed robbery with respect to the vehicle. *See Stebbing v. State,* 299 Md. 331, 353–54, 473 A.2d 903, 913–14 (holding that taking and asportation of property constitutes robbery even where intent to steal is not formed until after application of force resulting in death), *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Appellant's assignments of error with regard to the robbery conviction, therefore, are without merit.

### D. The Court's Refusal to Instruct the Jury on the Offense of Theft

■ In light of the fact that the charge of robbery was before the jury, Appellant contends that the trial court erred in refusing to propound a requested jury instruction on the uncharged, lesser offense of theft.[5] We disagree. There exists no rational basis upon which the jury could have concluded that Appellant was guilty of theft, but not guilty of

---

5. Because the State presented no evidence at trial as to the value of the items taken from the Goodwich home, Appellant presumably is arguing that he was entitled to an instruction on even misdemeanor theft.

robbery. For this reason, Appellant was not entitled to have the offense of theft submitted to the jury.

■■■ Appellant cites Maryland Rule 4–325(c) in support of his asserted right to a jury instruction on theft. That rule provides, in pertinent part: "The court may, and at the request of any party shall, instruct the jury as to the applicable law. . . ." The mandate of this rule does not apply in the present case, however, because Appellant was not charged with theft. Where a particular charge is not before the court, "it [i]s not incumbent on the judge to give an instruction under Md. Rule 4–235(c)." *Dean v. State*, 325 Md. 230, 240, 600 A.2d 409, 414 (1992). Rather, a trial judge's obligation to propound a requested jury instruction on an uncharged, lesser offense is evaluated in light of the principles established in *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989), and its progeny. *See Hagans v. State*, 316 Md. 429, 455, 559 A.2d 792, 804 (1989).

The defendant in *Hook* was convicted of, among other things, first degree murder. The primary issue on appeal was whether the trial judge erred in permitting the State to enter a *nolle prosequi* to a second degree murder charge. Also at issue was whether the trial judge erred in denying the defendant's requested jury instruction on second degree murder as a lesser included offense of first degree murder. *Hook*, 315 Md. at 33, 553 A.2d at 237.

Finding error in both regards, the *Hook* Court explained that there was evidence adduced at Hook's trial from which the jury reasonably could have determined that the defendant lacked the specific intent necessary for first degree murder. Hence, a rational basis existed for finding the defendant guilty of second degree murder, but not guilty of first degree murder. Under these circumstances, the State's decision to *nolle pros* the lesser offense was held to violate principles of "fundamental fairness essential to the very concept of justice." *Hook*, 315 Md. at 41–42, 553 A.2d at 242. The refusal to instruct the jury with regard to second degree murder similarly was erroneous and contrary to Supreme Court jurisprudence suggesting that a defendant in a capital case is entitled

to a requested instruction on a lesser included offense "when the evidence warrants such an instruction...." *See Hook,* 315 Md. at 41, 553 A.2d at 241 (reviewing Supreme Court treatment of lesser offense rule).

 In reviewing the denial of a request for an instruction on a lesser offense in this capital murder case, we must consider whether there exists, in light of the evidence presented at trial, a rational basis upon which the jury could have concluded that the defendant was guilty of the lesser offense, but not guilty of the greater offense. If a rational jury could not reach this conclusion, then the judge need not submit the lesser offense to the jury. Because the same test is used in assessing the validity of the State's decision to *nolle pros* a lesser included offense, *see, e.g., Jackson v. State,* 322 Md. 117, 127–28, 586 A.2d 6, 10–11 (1991); *Fairbanks v. State,* 318 Md. 22, 25–27, 566 A.2d 764, 765–67 (1989), we look to those cases for guidance. In so doing, we find *Burrell v. State,* 340 Md. 426, 667 A.2d 161 (1995), particularly instructive.

The appellant in *Burrell* was convicted as an accomplice to the armed robbery of a gas station attendant. On appeal, he asserted that because he neither had knowledge of, nor intended the use of, a gun during the course of the robbery, the judge erred in permitting the State to *nolle pros* a simple robbery charge. *Burrell,* 340 Md. at 435, 667 A.2d at 165. In rejecting this claim, we explained:

> "There was ample evidence at trial for a rational jury to convict [the appellant] of either participating in the armed holdup ... or, if jurors believed his claims that he was not a participant, to acquit him of the same.
>
> * * *
>
> There was absolutely no evidence at trial, however, from which a rational jury could infer that [the appellant] was guilty of aiding and abetting a simple robbery only. The gas station attendant testified that a gun was used. The eyewitness said he saw the attendant's hands in the air, from which a jury could infer that the men holding up the

station were using a deadly weapon. [The appellant] did not contest at trial the prosecutor's evidence that a weapon was used in the commission of the crime. Without any contravening evidence tending to disprove the use of a deadly weapon, the only rational inference from the evidence which *was* presented was that an armed robbery, not a simple robbery, had been committed.... The crime to which [the appellant] was an accomplice was unquestionably an armed robbery." (Emphasis in original).

*Burrell*, 340 Md. at 435–36, 667 A.2d at 165–66.

Applying the same principles to the instant case, we conclude that Appellant was not entitled to an instruction on theft in that there was no evidence at trial from which a rational jury could conclude that Appellant committed theft, but not robbery with a deadly weapon. The murder of Debra Goodwich, committed in furtherance of the taking of items from the Goodwich home, precludes this possibility. Appellant was not entitled, therefore, to a jury instruction on the uncharged, lesser offense.

### E. Victim Impact Evidence

Appellant next raises several issues concerning victim impact statements and the role of victim impact evidence at sentencing.

### 1.

In any case in which the State seeks the death penalty or imprisonment for life without the possibility of parole, the Division of Parole and Probation ("the Division") is required to prepare a pre-sentence investigation (PSI) report for consideration by the judge or jury at sentencing. Md.Code (1957, 1997 Repl.Vol.), Art. 41, § 4–609(d). A victim impact statement is a required component of this report. *Id.;* Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 781.[6]

---

**6.** Since the trial and sentencing of Appellant, certain portions of the relevant statutes have been transferred and renumbered. Because the

 In this case, the Division complied with the victim impact statement requirement by attaching approximately fifty letters from friends and colleagues of the victim to the PSI report. To indicate the incorporation of these letters, the author of the PSI report wrote, "See attached" under the "Victim Impact Statement" portion of the report. Appellant claims that these letters were improper, both in form and in substance. With regard to form, Appellant contends that, because the Division of Parole and Probation simply attached the letters to the PSI, it did not comply "with the statutory requirement that the Division of Parole and Probation *prepare* a victim impact statement." The applicable statutes, in fact, do not use the term "prepare" with regard to the Division's responsibility for victim impact statements, but instead require that the PSI report "include" a victim impact statement in certain instances. Appellant's position, therefore, is that merely stapling the information to the PSI report, with a notation that incorporates the letters by reference, is inadequate to satisfy the statutory requirement that victim impact evidence be "included" as part of the PSI report. We decline to adopt Appellant's narrow interpretation of the meaning of "included."

 As for the substance of the statements, Appellant asserts that the letters were improper because (1) they were authored by friends and colleagues who did not meet the statutory definition of "victim" for purposes of victim impact statements; and because (2) the content of the statements exceeded the limitation contained in § 781(d)(6) that victim impact statements pertain to the impact of the offense upon the victim or the victim's family. This allegation of error largely is disposed of by the fact that the multitude of letters from friends and colleagues of the victim were not admitted as evidence at the sentencing hearing. The only victim impact statements offered by the State and admitted by the judge were those composed by the victim's parents and grandmoth-

---

substance of the provisions remains unchanged, we shall cite the statutes as presently codified.

er. Even if we were to agree with Appellant that the letters from friends and colleagues were not proper victim impact evidence, therefore, it would be of no favorable consequence to Appellant. Evidence that is not admitted at sentencing ordinarily cannot be said to have had an unfairly prejudicial effect on the sentencing proceeding.

Counsel for Appellant suggested at oral argument, however, that the sentencing judge's mere awareness of the existence of these letters, notwithstanding the fact that they were not admitted, was somehow improper. We find no merit in this contention. A judge cannot rule on an evidentiary matter without being "aware" of the evidence that is the subject of his or her ruling. In those cases where the judge serves as trier of fact, it is presumed that he or she will consider only that evidence that is actually admitted. "[W]e have consistently reposed our confidence in a trial judge's ability to rule on questions of admissibility of evidence and to then assume the role of trier of fact without having carried over to his factual deliberations a prejudice on the matters contained in the evidenced which he may have excluded." *State v. Hutchinson,* 260 Md. 227, 236, 271 A.2d 641, 646 (1970) (finding no error in trial judge first admitting, and then excluding, confession where judge, sitting as trier of fact, declared that he would disregard the inculpatory statement in reaching verdict). If we were to reject this presumption and accept Appellant's argument, any judge who grants a motion to suppress, or otherwise rules to exclude, evidence would be precluded from further involvement in the case. This result would create an unworkable trial system. For these reasons, Appellant's argument must fail.

2.

The opportunity for a victim, or family member of the victim, to testify orally at sentencing is governed by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 780(a), which provides:

"In every case resulting in serious physical injury or death, the victim or a member of the victim's immediate family ...

may, at the request of the State's Attorney and in the discretion of the sentencing judge, address the sentencing judge or jury under oath or affirmation before the imposition of sentence."

In light of this provision and other legislation aimed at remedying what has been perceived as the justice system's neglect of crime victims, "trial judges *must* give appropriate consideration to the impact of crime upon the victims"; "[a]n important step towards accomplishing that task is to accept victim impact testimony wherever possible." *Cianos v. State*, 338 Md. 406, 413, 659 A.2d 291, 295 (1995) (emphasis in original).

In this case, Arlene Goodwich described the effect of her daughter's death, in part, as follows:

"I found my daughter dead on the floor of our home and every day of my life I am haunted by the vision of her lying there like a stone, still and cold, and her black hair fanned around her face. Her deep blue eyes were open and staring emptily. Her mouth was slightly ajar, but it was silent. This vision is a living nightmare, especially for a parent. And the shock and the terror and the horror of that day will live on in me forever.

I suffer from nightmares. I wake up shaking. I have panic attacks. I'm sometimes overcome by waves of nausea and it takes me a long time to get out of bed and face the day right now.

My concentration and my memory are a fraction of what they once were and I spend a lot of time walking around in circles feeling completely powerless and totally overwhelmed."

Arlene Goodwich also described to the judge the "pain and hurt and guilt and rage" that Debra's father has experienced as a result of the murder, as well as the "fear and terror" that so envelopes Debra's brother that the Goodwiches must keep all windows of their home closed and an elaborate security system activated. This testimony "inform[ed] the sentencing authority about the specific harm caused by the crime in question," *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct.

2597, 2608, 115 L.Ed.2d 720, 735, *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 28, 115 L.Ed.2d 1110 (1991), and Appellant does not dispute the propriety of its consideration by the judge.

 Appellant contends, however, that the testimony of the victim's mother in this case was improper to the extent that it included references to the impact on individuals beyond immediate family members. In support of his argument, Appellant cites Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 781(d). Pursuant to § 781(d), a victim impact statement must:

"(1) Identify the victim of the offense;

(2) Itemize any economic loss suffered by the victim as a result of the offense;

(3) Identify any physical injury suffered by the victim as a result of the offense along with its seriousness and permanence;

(4) Describe any change in the victim's personal welfare or familial relationships as a result of the offense;

(5) Identify any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

(6) Contain any other information related to the impact of the offense upon the victim or the victim's family that the court requires."

Because this statute makes reference only to the impact of the offense on the victim or the victim's family, Appellant asserts that victim impact testimony as to the effect of the crime on individuals beyond the victim's family is not permitted.[7]

---

7. This argument, of course, presumes that · § 781(d) represents the totality of admissible victim impact evidence, to the exclusion of any other types of victim impact evidence. This Court has previously interpreted this type of statute as establishing the *"minimum* standards for the information to be provided to judges" prior to the imposition of sentence. *Lodowski v. State,,* 302 Md. 691, 745, 490 A.2d 1228, 1256 (1985) (emphasis added) (interpreting predecessor to § 781(d), the substance of which is identical to § 781(d)). Indeed, we recently observed in *Williams v. State,* 342 Md. 724, 763, 679 A.2d 1106, 1126 (1996), that statements of friends and colleagues of the victim "may

■ Appellant's exclusive reliance on this statutory provision is misplaced. Section 781(d) pertains only to written victim impact statements as a required component of a PSI report. *Lodowski v. State,* 302 Md. 691, 743, 490 A.2d 1228, 1254 (1985) (stating that the predecessor to § 781(d) "is concerned only with victim impact evidence that is submitted to the court or jury by way of a statement included in a presentence investigation report"), *vacated on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). It does not, by its express terms, extend to oral victim impact testimony; indeed, it would be difficult to conform oral testimony to the requirements of this statute. Because written victim impact statements are prepared and reviewed prior to the commencement of the sentencing proceeding, their content can be effectively delineated by statute. Oral victim impact testimony, in contrast, cannot be controlled with such precision. Victim impact witnesses testify under great emotional strain and, in venting their pain and frustration, may make an occasional reference to the impact of the crime on individuals beyond the victim's family. An emotionally distraught witness may mention, for example, that "everyone" misses the victim. This comment is hardly likely to influence the sentencing authority and should not form the basis for reversal. Therefore, although § 781(d) may provide guidance as to appropriate matters for victim impact witnesses to address orally at sentencing, it should not be viewed as establishing the outer limits of that testimony such that any deviation warrants automatic reversal of the sentence imposed. Appellant's assertion to the contrary is without merit.

■ At a capital sentencing proceeding, the permissible scope of victim impact testimony instead lies within the sound discretion of the presiding judge, as limited by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413(c)(1)(v). This statute defines the type of evidence that is admissible at a capital sentencing

well be admissible if [they are] included in or incorporated as part of the PSI report prepared by the Division of Parole and Probation, which has wide latitude in preparing such reports."

proceeding to include "[a]ny . . . evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements." The impact of a crime on a victim or the victim's family is both relevant and probative.[8] *Evans v. State*, 333 Md. 660, 687, 637 A.2d 117, 130, *cert. denied*, 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994). The relevance and probative value of the impact of the offense on individuals beyond the victim's family, however, is less certain. Victim impact testimony generally should be limited, therefore, to the impact of the crime on the victim or the victim's family members. In this case, however, we do not find that Arlene Goodwich's remarks warrant reversal.

First, a review of the transcript in the instant case reveals that Arlene Goodwich delivered her testimony without a single objection from defense counsel. The error that Appellant alleges, therefore, has not been properly preserved for review by this Court. Furthermore, even it were preserved, we would consider any error in this regard to be harmless beyond a reasonable doubt. Throughout what amounts to seventeen pages of transcribed testimony, the only remarks that related to the impact of Debra's death on individuals beyond the immediate family were that "it was very obvious to me that Debbie was missed by people she worked with, by people in the community who knew her . . .," and that "[Debbie's] aunts and her uncles and her cousins . . . cry because they know she won't be present anymore and they won't get to know her as she may have become. . . ." We are satisfied that, in light of all the other evidence before the judge, these remarks did not influence the imposition of the death penalty. Accordingly, any error in the admission of these statements is harmless beyond a reasonable doubt. *See Evans*, 333 Md. at 684, 637 A.2d at 129 (concluding that error was harmless beyond a

---

**8.** Pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 780(b), the defendant has the right to cross-examine victim impact witnesses with regard to "factual statements made in the address to the judge or jury."

reasonable doubt where Court was satisfied that any erroneously admitted evidence did not influence sentence imposed).

### 3.

Finally, Appellant argues that the admission of victim impact statements in a PSI report violates an accused's constitutional right, in a criminal proceeding, to be confronted with the witnesses against him. The State counters that the same principles that justify the admission of the PSI report itself apply with equal force to the victim impact statements contained in that report. In addition, the State contends that even if Appellant is correct that cross-examination of the authors of the victim impact statements is permitted, Appellant made no attempt to exercise that right and cannot now claim error in his own tactical decision. We agree with the State that Appellant's "failure to avail himself of [the opportunity to confront the victim impact witnesses] does not translate into a denial of his right of confrontation."

The Confrontation Clause of the Sixth Amendment and Article 21 of the Maryland Declaration of Rights confer upon a defendant in a criminal proceeding the right to confront the witnesses against him. *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, 978, *cert. denied,* —— U.S. ——, 117 S.Ct. 102, 136 L.Ed.2d 56 (1996). Ordinarily, the right of confrontation includes the right to cross-examine witnesses concerning matters that might expose any bias, interest, or motive to falsify. *Ebb,* 341 Md. at 587, 671 A.2d at 978 (citing *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974)). This right "extends to the sentencing phase of a capital trial and applies to [live,] victim impact witnesses as well as factual witnesses." *Grandison v. State,* 341 Md. 175, 206, 670 A.2d 398, 413 (1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996).

Whether a defendant is entitled to cross-examine the authors of written, victim impact statements has not previously been considered by this Court. The issue was touched upon, however, in *McWilliams v. State,* 640 So.2d 982 (Ala.

Crim.App.1991), *aff'd in part and remanded in part sub nom., Ex parte McWilliams*, 640 So.2d 1015 (Ala.1993), where the appellant similarly argued that his constitutional right of confrontation was violated in that he was not afforded the opportunity to cross-examine the authors of victim impact statements. *McWilliams*, 640 So.2d at 993. The court rejected this argument apparently on two bases. The court first suggested that the appellant's right of confrontation was not denied because although the appellant would have been entitled to call the authors of the statements as witnesses, he elected not to exercise this right. *McWilliams*, 640 So.2d at 995. Furthermore, the court explained that Alabama's death penalty statute permits the introduction at sentencing of " '[a]ny evidence which has probative value and is relevant to sentence ... regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.' " *McWilliams*, 640 So.2d at 994 (quoting *Ex parte Davis*, 569 So.2d 738, 741 (Ala.1990), *cert. denied*, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991)) (in turn citing Ala.Code 1975 § 13A–5–45(d)). Because "[t]he evidence contained in the victim impact statements was relevant [9] ..., and the defendant was given an opportunity to rebut th[at] evidence," the court found no error. *McWilliams*, 640 So.2d at 995 (citation omitted) (footnote added).

▪ The same factors justify a finding that Appellant's right of confrontation was not violated in this case. Appellant was provided with copies of the victim impact statements well in advance of the commencement of the sentencing proceed-

---

**9.** The Supreme Court has recognized the importance of victim impact evidence to the sentencing process. *See Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991) (observing that "victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime...."). This Court, as well, has acknowledged that "there is a reasonable nexus between the impact of the offense upon the victim or the victim's family and the facts and circumstances surrounding the crime[,] especially as to the gravity or aggravating quality of the offense." *Lodowski*, 302 Md. at 741–42, 490 A.2d at 1254.

ings. He was, in fact, successful in having certain portions of those statements redacted. Notwithstanding Appellant's access to the statements and awareness of the individuals who authored them, he made no attempt to subpoena the authors to appear at sentencing and undergo cross-examination. The tactical decision to forego cross-examination of witnesses does not amount to a denial of the right of confrontation. *See Brown v. State,* 230 Md. 467, 469–70, 187 A.2d 683, 684–85 (1963) (referring to failure to exercise right of cross-examination as a tactical decision). In addition, Appellant had the opportunity to present evidence in rebuttal to any information contained in the victim impact statements. Appellant's claim that his confrontation rights were violated, therefore, is without merit.

In light of Appellant's decision not to pursue cross-examination of the authors of the statements, it is unnecessary for us to decide whether the Confrontation Clause requires that cross-examination be allowed upon request. We note, however, that the right of confrontation poses no obstacle to the admission of the PSI report itself, notwithstanding the fact that the report is drafted by individuals whom the defendant is unable to cross-examine. *See Tichnell v. State,* 290 Md. 43, 58–59, 427 A.2d 991, 999 (1981) (observing that "the constitutional right of confrontation does not proscribe the use of presentence reports in capital sentencing proceedings"); *Driver,* 201 Md. at 32, 92 A.2d at 573–74 (stating that "the sentencing judge may consider information, even though obtained outside the courtroom, from persons whom the defendant has not been permitted to confront or cross-examine"). The right of confrontation with regard to victim impact statements that are contained in the PSI reports may well be satisfied, therefore, if the defendant is given a copy of the statements and is provided an opportunity to rebut any information contained therein. *See McWilliams,* 640 So.2d at 994–95. We need not resolve the issue, however, for purposes of this appeal.

### F. The Admission at Sentencing of Evidence
### of Appellant's Prior Convictions

Appellant next asserts that the judge erred in permitting the introduction, at sentencing, of evidence concerning Appellant's prior convictions for non-violent offenses, as well as evidence of other charges that did not result in convictions. The PSI report admitted by the sentencing judge established that Appellant previously had been convicted of various motor vehicle offenses, possession of controlled dangerous substances, theft, daytime housebreaking, and burglary. According to Appellant, "the PSI [also] include[d] a number of offenses which were resolved by stet or nol pros, including controlled dangerous substance offenses, theft, malicious destruction, disorderly conduct, burglary, and motor vehicle offenses." Citing the decision of this Court in *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), Appellant contends that the judge committed prejudicial error in allowing this evidence. We disagree.

Preliminarily, we note that this alleged error has not been preserved properly for review. Defense counsel voiced no objection to the introduction of the PSI report and other court documents at the sentencing proceeding. Furthermore, Appellant's suggestion that unadjudicated charges were included on the PSI report is incorrect. These charges were redacted from the PSI report prior to the State's introduction of the report at sentencing. Hence, they were not considered by the judge in imposing the sentence. Only Appellant's prior convictions, as enumerated in the PSI report, are at issue.[10]

---

10. In our review of the record, we noticed that the State neglected to redact from the certified court documents a few, minor motor vehicle and drug offenses that were resolved by stet or nolle prosequi. To the extent that the admission of these offenses was error, it was harmless beyond a reasonable doubt. As will be explained, *infra*, Appellant himself introduced evidence of his history of drug abuse, and the motor vehicle offenses cannot be said to have influenced the imposition of the death penalty.

██ In a capital sentencing proceeding, the admissibility of evidence is governed by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413(c)(1), which provides:

"The following type of evidence is admissible in this proceeding:

(i) Evidence relating to any mitigating circumstance listed in subsection (g) of this section;

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of this section of which the State had notified the defendant pursuant to § 412(b) of this article;

(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

The five subsections of § 413(c)(1) are read in conjunction with one another such that evidence that is admissible under subsections (i) through (iv) must also have "probative value" and be "relevant to sentence," as required by subsection (v). *Conyers v. State*, 345 Md. 525, 566, 693 A.2d 781, 800 (1997).

In *Scott*, the State conceded the existence of a mitigating circumstance that was admissible pursuant to subsection (i): the absence of a prior conviction for a crime of violence.[11] *Scott*, 297 Md. at 237, 465 A.2d at 1128. The State also proffered evidence, however, that the accused had committed two unrelated murders for which he had neither been convict-

---

11. Subsection (g), to which reference is made in subsection (i), includes as a mitigating circumstance the fact that "[t]he defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence."

ed nor pled guilty or *nolo contendere. Id.* The Court held that the admission of this evidence amounted to prejudicial error. In so holding, the Court concluded that the proper interpretation of subsection (i), as supplemented by subsection (g), is that evidence of other crimes is restricted to "crimes of violence for which there has been a conviction." *Scott,* 297 Md. at 247, 465 A.2d at 1134.

As we recently clarified in *Conyers, supra,* however, the "crime of violence" limitation announced by the *Scott* Court pertains only to evidence offered in connection with mitigating circumstances under subsection (i). 345 Md. at 572, 693 A.2d at 803. In contrast, the prior convictions in the case at bar were admitted under subsection (iv) as part of a PSI report. The *Scott* limitation thus does not apply. Rather, the only restrictions on the admissibility of "[r]eliable information contained in a[PSI] report" is that it have "probative value and [be] relevant to sentencing," and that "the defendant [be] accorded a fair opportunity to rebut any statements." *Hunt v. State,* 321 Md. 387, 431–32, 583 A.2d 218, 239 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). Evidence of Appellant's prior convictions as set forth in the PSI, therefore, was admissible.

There is yet another basis for rejecting Appellant's claim of error with regard to evidence of his prior criminal record. At the sentencing proceeding, Defense counsel elicited extensive testimony concerning Appellant's prior criminal history and drug use. Counsel's strategy apparently was to portray Appellant as a mere petty thief and burglar, who suffered from a drug addiction and who intended to commit a non-confrontational daytime housebreaking, as opposed to murder. Appellant thus introduced at sentencing substantially the same evidence about which he now complains.[12] "[T]he admission of improper evidence cannot be

---

12. It was suggested at oral argument that the tactical decision to portray Appellant as a "lesser" criminal was invalid as a matter of law. We disagree. *See Oken v. State,* 343 Md. 256, 290, 681 A.2d 30, 47 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 742, 136 L.Ed.2d 681

used as grounds for reversal where the defendant gives testimony on direct examination that establishes the same facts as those to which he objects." *Hillard,* 286 Md. at 156, 406 A.2d at 421. For this reason as well, Appellant's claim must fail.

### G. The Prosecution's Closing Argument at Sentencing

■ The penultimate issue presented by Appellant is whether the prosecutor engaged in improper closing argument at the sentencing hearing. Appellant takes exception to the prosecutor's explanation, as follows, of the purpose of victim impact evidence:

> "Now, Your Honor, the reason victim impact evidence is admissible in a death penalty sentencing proceeding is to rebut information about the defendant's childhood or background that's presented to you in mitigation."

Appellant asserts that this explanation was "erroneous," "misleading," and inimical to the "constitutionally-protected role of mitigating evidence in capital sentencing proceedings." The function of victim impact evidence, Appellant argues, is not to counterbalance mitigating evidence, but to assess the seriousness of the crime and the harm caused by its commission. The prosecution thus misinformed the judge about the role of victim impact evidence.

In *Payne, supra,* the Supreme Court described the role of victim impact evidence as follows:

> "We are now of the view that a State may properly conclude that for the jury *to assess meaningfully the defendant's moral culpability and blameworthiness,* it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. '[T]he State has a legitimate interest *in counteracting the mitigating evidence* which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as

---

(finding that defense counsel's decision to present evidence, through expert testimony, that defendant suffered from mental disorder of sexual sadism in the hope that it would convince jury not to impose death penalty was valid trial strategy).

an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' *Booth [v. Maryland,* 482 U.S. 496, 517, 107 S.Ct. 2529, 2540, 96 L.Ed.2d 440, 457 (1987)]." (Emphasis added).

501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735. This passage from *Payne* suggests that victim impact evidence may be used both to assess the harm caused by the defendant's actions, as suggested by Appellant, and to counteract mitigating evidence, as argued by the State in closing argument. The prosecutor thus did not necessarily misstate the purpose of victim impact evidence.

 Even if the prosecutor were incorrect in her assessment of the role of victim impact evidence, however, this comment during closing argument would not constitute reversible error. The death sentence in this case was imposed by a judge, not a jury. Trial judges are presumed to know the law and to apply it properly. Regardless of the prosecution's representation of the purpose of victim impact evidence, therefore, the court is presumed to have made proper use of the victim impact evidence. Nothing in the record suggests otherwise. In fact, the judge made no mention of the victim impact evidence in delivering the sentence.

### H. The Constitutionality of Maryland's Death Penalty Statute

Appellant's final argument is that Maryland's death penalty statute is unconstitutional because (1) it requires the defendant to establish mitigating circumstances by a preponderance of the evidence; (2) it requires the defendant to establish that arguably mitigating circumstances that are not enumerated in the statute are, in fact, mitigating circumstances; and (3) it requires a death sentence when aggravating circumstances outweigh mitigating circumstances by a preponderance of the evidence rather than by some higher standard.

" 'We have addressed these claims in prior cases and have rejected each of them. *See Grandison v. State,* 341 Md.

175, 231, 670 A.2d 398, 425 (stating that a similar claim, "though made time and time again over the years, has been consistently rejected by this Court"), *cert. denied,* —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Whittlesey v. State,* 340 Md. 30, 82–83, 665 A.2d 223, 249 (1995) (rejecting similar constitutional challenges to Maryland death penalty statute), *cert. denied,* —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Wiggins v. State,* 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991) (finding no merit in challenges to defendant's burden regarding statutorily recognized and other mitigating factors and to burden of proof), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).' "

*Conyers,* 345 Md. at 576, 693 A.2d at 805–06 *(quoting Perry v. State,* 344 Md. 204, 247–48, 686 A.2d 274, 295 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997)).

## I. Other Considerations

In addition to considering the arguments advanced by Ball on this appeal, we have also considered the imposition of the death sentence from the standpoint of the factors set forth in Article 27, § 414(e), and we make the following determinations:

(1) The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) The evidence supports the trial court's findings of statutory aggravating circumstances under § 413(d); and

(3) The evidence supports the trial court's finding that the aggravating circumstances outweigh the mitigating circumstances.

JUDGMENT AFFIRMED.