REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1887

September, 2013

CURTIS MAURICE LOPEZ

v.

STATE OF MARYLAND

Krauser, C.J.
Arthur,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Krauser, C.J.

Filed:  February 2, 2017

Curtis Maurice Lopez, appellant, entered *Alford* pleas[1] to the robbery and first-degree murder of Jane McQuain and the subsequent kidnapping and first-degree murder of her eleven-year-old son, William McQuain, in the Circuit Court for Montgomery County. He was thereafter sentenced, by that court, to multiple terms of imprisonment, the longest of which were two consecutive terms of life imprisonment, without the possibility of parole.[2] Subsequently, however, this Court granted Lopez's application for leave to appeal. That application presented the two issues that are now before us, namely:

I. Whether the trial court erred in denying Lopez's request to direct the State "to disclose and state with particularity" what it intended to introduce at the sentencing hearing pursuant to Maryland Rule 4-342(d), and

II. Whether the sentencing court erred in permitting a "music/video slide show" depicting the lives of the victims to be played at the sentencing hearing.

---

[1] In accordance with *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), "[a]n *Alford* plea is 'a guilty plea containing a protestation of innocence,' which 'lies somewhere between a plea of guilty and a plea of *nolo contendere*[,]' where a 'defendant does not contest or admit guilt.'" *Jackson v. State*, 207 Md. App. 336, 361 (2012) (quoting *Bishop v. State*, 417 Md. 1, 18-19 (2010)). For appellate purposes, "an *Alford* plea is the functional equivalent of a guilty plea," which means that it can be appealed only with leave of court. *See* Md. Code (2013 Repl. Vol.), § 12-201(e)(2) of the Courts & Judicial Proceedings Article; *Ward v. State*, 83 Md. App. 474, 480 (1990).

[2] Lopez was sentenced to two consecutive terms of life imprisonment, without the possibility of parole, for the first-degree murders of Jane and William McQuain; to a term of thirty years' imprisonment for the child kidnapping of William, to run consecutively to the two life-without-parole terms of imprisonment; and to a term of twelve years' imprisonment for the robbery of Jane, to run concurrently with the thirty-year term of imprisonment for child kidnapping. An additional conviction was entered for kidnapping, which was merged into the conviction for child kidnapping, for sentencing purposes

We hold that, although the State's presentencing notice to Lopez fell short of the requirement of Maryland Rule 4-342(d) that the "State's Attorney shall provide the information that the State expects to present at sentencing" to the defense, the inadequacy of that notice did not unfairly prejudice Lopez at sentencing. We further hold that the sentencing court did not abuse its discretion in allowing the victim impact video at issue to be shown during Lopez's sentencing hearing. Accordingly, we shall deny his request to vacate his sentences and affirm.

We now turn to the four proceedings that are relevant to Lopez's two claims: the plea hearing, the two presentencing disclosure hearings, and the sentencing hearing.

**Plea Hearing**

According to the undisputed statement of facts, proffered by the State, at Lopez's plea hearing, Lopez married Jane McQuain, while he was imprisoned in Pennsylvania on an unrelated conviction for attempted murder. Then, while Lopez was still incarcerated, Ms. McQuain became pregnant, by another man, and, ultimately, gave birth to William. After Lopez was released from prison, he took up residence in North Carolina, while Ms. McQuain and her son, William, continued to reside in Maryland.

In September 2011, upon learning that Ms. McQuain had recently inherited a significant amount of money from an uncle and had made several expensive purchases with that inheritance, Lopez contacted Ms. McQuain and informed her of his intention to visit her and William at their Maryland home. After arriving in Maryland, Lopez stayed with

2

Ms. McQuain and her son, at McQuain's residence, from September 16th through September 30th of 2011.

On the morning of the last day of his visit, September 30th, Jane McQuain dropped William off at a friend's house for an overnight stay, intending to pick him up the next day. That evening, however, as Ms. McQuain lay in her bed, Lopez struck her in the head with a thirty-pound dumbbell and stabbed her twice in the back with a butcher knife, inflicting fatal wounds. The next morning, Lopez used Ms. McQuain's bank card to withdraw money from her bank account and then drove her car to where William was staying. After arriving there, he used Jane McQuain's cell phone to text the eleven-year-old William to leave his friend's house and come outside. When William did so, Lopez told him to climb "into the car." Then, with William in the car, Lopez drove to Ms. McQuain's storage unit. From that storage unit, Lopez retrieved, among other things, a metal baseball bat, which he used, later that day, to beat William to death, shattering his skull into 36 pieces. Lopez thereafter drove Ms. McQuain's car to North Carolina, where he was arrested.

**Presentencing Disclosure Hearings**

Before sentencing, the State moved to compel disclosure of an expert witness, whom the defense intended to call at Lopez's sentencing hearing. In his response to that motion, Lopez's counsel accused the State of failing to provide him with "any information that the State expect[ed] to present to the court for consideration in sentencing," as required by Maryland Rule 4-342(d), and requested that the State be compelled, in writing, to

identify, from approximately 10,000 pages of previously disclosed discovery material, what information it intended to present at sentencing.

During the ensuing hearing on the State's motion to compel disclosure of an expert witness (which was granted by the circuit court), Lopez's counsel reiterated his complaint and demand for a remedial order. The prosecutor responded that the State had given adequate notice, under Rule 4-342(d), by informing Lopez that it was "going to use everything" that it had previously provided his counsel, including information from "years ago." Taking issue with that response, defense counsel rejoined: "[W]hat [the prosecutor] just said about the letter they sent us back in January, that, that anything they've given us in 10,000 pages of discovery is fair game, is absolutely inadequate." The court then directed the State to file a written response to defense counsel's request for more specific information and scheduled a hearing on that matter.

In the written response it subsequently filed, the State insisted that it had fully complied with Rule 4-342(d), relying principally on its January 24, 2013, letter to defense counsel, wherein it stated that it "reserve[d] the right to use any materials provided in discovery at the sentencing[.]" The State further claimed that Lopez's request for a more specific and precise statement of what information it intended to present at sentencing was "unprecedented" and that, in any event, "discovery has been provided since 2011," and thus, Lopez had had a "reasonable opportunity to investigate" any of the information it had provided.

At the hearing on his presentencing disclosure request that followed, defense counsel asserted that Rule 4-342(d) "is a rule of disclosure that" requires the State to

4

specify "what [it] intends to introduce at sentencing[.]" Counsel then went on to explain

what he was seeking and why:

> We are requesting that we be . . . given some idea of what the State intends to rely on, because otherwise it's very difficult to marshal our efforts in a way that we can provide effective assistance of counsel, that we can prepare to rebut what the State puts on at sentencing in a case where we have gotten this volume of discovery, discovery that reaches back over 30 years. . . .
>
> I would estimate that there are about 2,000 pages from a 1987 Harrisburg, Pennsylvania attempted murder case, including medical records of the victim in that case, hundreds of pages of medical records, motions that were filed, statements of witness.[3] There were hundreds of pages from 14 years in DOC in Pennsylvania, including – I've of course referred to the mental health record – but movement from institution to institution, parole files, records of, or parole being requested, parole being, when it was granted but before on attempts when it was denied. We have . . . at least 100 pages related to child support litigation. We have Mr. Lopez's employment records in North Carolina. . . . I would say that the majority of what we've been given was not . . . discovery of actual facts that would be used to prove up this case at trial . . . .
>
> And Mr. Lopez is a 46-year-old man who . . . was incarcerated for a period of 14 years. He was then on parole, which he successfully completed. He was on parole from October of 2000 until . . . October of 2009 when he successfully completed it. There are records related to that. And I know [the prosecutor] is going to get up and say, "Well, what it is that the State intends to introduce at you've had all that . . . for a long time," and that's true, but what's the purpose of this rule is it's not narrow down sentencing? . . . .

---

[3] For details regarding Lopez's prior convictions, see *infra* note 4.

> **We are concerned that under the Sixth Amendment we won't be able to give effective assistance if we don't know what we need to be prepared to rebut out of all of this universe of information.**

(Emphasis added.)

In reply, the prosecutor characterized the defense motion as "novel," one that he had "never seen . . . before[,]" and that, contrary to defense counsel's claim that the State had failed to provide enough discovery, "we're here because the State has provided too much discovery." In the State's view,

> [t]he rule says . . . all materials must be given in advance for sentencing. That has been done. That's no dispute. We're going to use all materials that we have provided to them. That includes pictures of the crime scene from where he killed his wife, pictures from the woods where he killed an 11-year-old boy with a baseball bat. We're going to show pictures, like we did at the plea . . . of where he hid the baseball bat and where he went in North Carolina and covered up materials. We'll talk about DNA. We're going to talk about everything. We're going to talk about his previous conviction, where he left somebody for dead on the side of the road. We're going to talk about when he put something over a [prison] guard's head, trying to kill him. We're going to talk about everything.
>
> So I think they really should be prepared for everything that they've been provided, and I think a lot of it is redundant.

The prosecutor further stated that, with the exception of the presentence investigation report and victim impact statements, the defense had everything the State was required to produce. Then, following the prosecutor's assurance to the court that "only a handful of people [would be] speaking on behalf of the victim impact," the circuit court denied defense counsel the relief he sought.

6

**Sentencing Hearing**

At the outset of the sentencing hearing, defense counsel moved to exclude a victim impact video, which the State intended to present, consisting of a slide show of 115 still photographs, showing the victims, Jane and William McQuain, throughout their lives, either alone, together, or with a family member or friend. The State planned to show this victim impact video during the testimony of Bill McQuain, the brother of Jane McQuain and the uncle of William, who had been designated as the "Victims' Representative." The video montage, in question, was accompanied by instrumental music, a popular song, and a bell, ringing as it began and then, once again, as it ended. The only words that appeared on the screen, during that video, were the video's title, "The Story of Jane and William," which could only be observed at the beginning of the video montage, and then, a "credits list" of individuals who had provided photographs for the montage, at its conclusion.

Asserting that this type of victim impact presentation "is done all the time[,]" the prosecutor, as well as counsel for the Victims' Representative, claimed that the video was "not inflammatory in any way" and was therefore permissible, as victim impact material, under *Payne v. Tennessee*, 501 U.S. 808 (1991). The trial court ultimately denied the defense's motion to exclude the victim video montage, stating:

> I have discretion to allow whatever I like or whatever is appropriate in this kind of sentencing proceeding. I'm told that it is just pictures, that it is six minutes. This is their one, the victim's [sic] family's one opportunity to show me, or anyone else, the extent of the impact upon them. And so I know you don't like it, but this is what they would like to do, and in some respects, it would be cathartic to, for the last time, be able to fully discuss their sister and their nephew. So I'm going to allow the video to be played.

7

At the end of testimony of the Victims' Representative, the State played the victim impact video. When it concluded, defense counsel asked the sentencing judge to recuse herself, claiming that the video was "unduly prejudicial," "just appeal[ed] to emotions," and was "over the top." The court denied that request, asserting, "You're entitled to show pictures, they're pictures." Then, in imposing sentence, the circuit court stated:

> There's not much more I can say other than the eloquent words we have heard from all of the victims here today and in their victim impact statements . . . .
>
> [T]he monstrous nature of this crime cannot convert this case into concurrent time or any prospect of parole. You stabbed Jane McQuain and crushed her skull with a 30-pound dumbbell. You took William from a sleepover, got a baseball bat out, took him into the woods, and crushed his skull into many pieces. And this was a person who called you "dad."
>
> Your difficult childhood, you had a crime ridden neighborhood, an abusive family, abandonment issues, a history of mental illness in your family, a rotten prison experience which you probably deserved.[4] The riot in the prison may help explain to somehow any human being could

---

[4] Lopez's prior convictions include multiple robberies, theft, attempted murder, and aggravated assault, dating back to age eighteen and occurring "almost immediately . . . each and every time he [was] released." Particularly noteworthy was Lopez's conviction for an attempted murder and robbery in 1987, when he was twenty years old. According to the State, Lopez and another man carjacked an acquaintance, then forced him out of his vehicle in the woods. When the victim ran toward Interstate 81, Lopez chased him down and stabbed him eighteen times, leaving him on the road to die and telling his accomplice, "Dead men tell no tales." The victim survived only because a passing emergency medical technician came to his aid.

Moreover, while incarcerated for those crimes, Lopez participated in a prison riot during which he put a pillowcase over the head of a corrections officer, then stole money and nail clippers from the victim's pocket. Furthermore, on other occasions, while in prison, Lopez disrupted prison security, refused to work, lied to prison employees, engaged in fights, and possessed contraband.

so diabolically and methodically plan to brutally murder the two people on earth who loved you.

As for second chances, you have had at least one already. Divine providence stepped in after you stabbed that acquaintance 18 times for his vehicle, when strangers stepped in and saved that man on the highway.

You were released in 2000 and went on to commit a more heinous crime. I will not cause society to take another chance. . . .

Following sentencing, this Court granted Lopez leave to appeal both the denial of his request that the State be ordered to provide some indication, to the defense, of what information, from a substantial pool of documents, it intended to adduce at sentencing, as well as the State's presentation, over objection, of the victim impact video at sentencing.

# I.

## Motion to Compel Compliance with Rule 4-342(d)

Maryland Rule 4-342(d) requires that

[s]ufficiently in advance of sentencing to afford the defendant a reasonable opportunity to investigate, the State's Attorney shall disclose to the defendant or counsel any information that the State expects to present to the court for consideration in sentencing. If the court finds that the information was not timely provided, the court shall postpone sentencing.

"The purpose of Md. Rule 4-342(d) is to notify the defendant of the information the State will present against him or her at the sentencing hearing and afford the defendant a reasonable opportunity to investigate the State's information in order to prepare for sentencing." *Dove v. State*, 415 Md. 727, 739 (2010). That did not occur here, claims

9

Lopez, because the State did not "disclose and state with particularity what it intended to introduce at the sentencing hearing[.]" Instead, it merely "inform[ed] defense counsel that it intended to 'use all materials that [it had] provided to them' in pretrial discovery[,]" a disclosure, which, in effect, left Lopez in a sea of material, without a compass. "[T]he trial court should have required," he asserts, that the State "provide disclosure with greater specificity." He therefore requests that we vacate his entire sentence and remand for resentencing.

The State counters that "[t]he trial court properly exercised its broad discretion in denying Lopez's request" because "[t]he plain language of Maryland Rule 4-342(d) does not require the State's Attorney 'to state with particularity, exactly what they intend[] to introduce at sentencing[,]'" as demanded by Lopez. Moreover, in the State's view, Lopez's "particularity" argument improperly equates the State's disclosure obligation under this rule with its duty to provide a bill of particulars under Maryland Rule 4-241.

We believe, however, the State's presentencing disclosure fell short of what is required under Rule 4-342(d). But, as Lopez has failed to show that he suffered any resultant prejudice from that lack of particularity in the State's notice, a new sentencing hearing is not warranted.

**A.**

In *Dove v. State*, 415 Md. 727, the Court of Appeals declared that Rule 4-342(d) "mandates the disclosure of 'any information the State expects to present to the Court for consideration in sentencing,' including any witnesses and any documents or physical evidence on which it intends to rely." *Id*. at 738-39 (citation omitted). This rule, explained

10

the *Dove* Court, "is broad and encompasses any information on which the State plans to rely at sentencing[.]"  But it "does not," warned the Court, "make an exception for substantial compliance[.]"  *Id.* at 739.  That is to say, strict compliance with the rule is required.  *Id.*; *accord Green v. State*, 127 Md. App. 758, 773-74 (1999).  Moreover, "the defendant's awareness that certain types of evidence might be presented at the sentencing hearing is not sufficient to fulfill the Rule's notice requirement," *Dove*, 415 Md. at 740 (citing *Green*, 127 Md. App. at 774), although, as we shall see, the defendant's actual knowledge of the information that is, in fact, adduced at a sentencing hearing and relied upon by the sentencing court may be relevant in determining whether a rule violation prejudiced the defendant or amounted to no more than harmless error.

The Court of Appeals found, in *Dove*, that the State had violated Rule 4-342(d) by failing to disclose, before sentencing, that it intended to present a previously undisclosed fingerprint card, in conjunction with the testimony of a previously identified fingerprint expert, at sentencing.[5]  *Id.* at 733-35, 740-41, 746.  The State had belatedly "presented the fingerprint card in question as substantive evidence of the defendant's identity," observed

---

[5] The State failed to disclose, prior to the sentencing hearing, not only the fingerprint card but also the substance of the expert witness's testimony. *Dove v. State*, 415 Md. 727, 740 n.4 (2010).  As the *Dove* Court observed, the State could have complied with the notice requirement of Rule 4-342(d) "by, at least, furnishing defense counsel, in advance of sentencing, with a copy of the fingerprint card[] and/or a copy of the expert witness's written report, if any, or both."  *Id.*  If, however, there was no extant written report, the State could have satisfied the rule, noted the Court, by "disclos[ing] to the defense the substance of the expert witness's testimony and provid[ing] the defense with a copy of any documents or reports the expert relied on and/or the State intended to offer into evidence."  *Id.*

11

the Court, to confirm that he had been previously convicted of possession with intent to distribute heroin and thereby warranted an enhanced sentence. *Id.* at 740-41. But the State should have provided Dove with the fingerprint card before sentencing, declared the Court, to afford him "a reasonable opportunity to investigate the State's information in order to prepare for sentencing." *Id.* at 739. And, because it did not, the sentencing court should have "postpone[d] the hearing," in the Court's view, given the rule's express instruction that, "[i]f the court finds that the information was not timely provided, the court shall postpone sentencing." *Id.* at 741.

The *Dove* Court then turned to the question whether the harmless error doctrine is applicable to a violation of Rule 4-342(d). While acknowledging that such a violation is "rarely harmless," the Court held that, when an appellate court determines that there was a violation of Rule 4-342(d), it should next consider whether that violation constituted "harmless error." *Id.* at 742-43. Because, in that case, the fingerprint card was not cumulative to other, properly admitted evidence, and because it was relied upon by the sentencing court in determining whether the State had met its burden of proof that Dove had been previously convicted of a drug-related offense, the Court concluded that the sentencing court's error, in declining to postpone the sentencing hearing, was not harmless. *Id.* at 745-46, 749-50. Consequently, the Court vacated Dove's sentence and ordered a new sentencing hearing. *Id.* at 751-52.

Similarly, in *Green v. State*, *supra*, 127 Md. App. 758, this Court held that the State had violated Rule 4-342(d) in presenting, at sentencing, a surprise witness, who then testified that the defendant had shot him, notwithstanding the fact that the State had

12

mentioned the witness during trial. *Id.* at 773. "Without the notice mandated by the rule, there was no reason," we observed, "to investigate" that witness, nor any reason to prepare for his testimony. *Id.* Moreover, "[t]he word 'shall' in the rule means that it was mandatory that the State disclose 'any evidence . . . [i]t expected to present,' not merely identification of those whom it might call to testify." *Id.* at 773-74.

To be sure, Maryland Rule 4-342(d) does not require the State to provide a line-item list of every fact to be presented at sentencing. Nor was Lopez requesting such a detailed disclosure by the State. What his counsel did demand was that the State identify, from among more than 10,000 pages of previously disclosed discovery material, the information that it intended to present at Lopez's sentencing hearing.

But, instead of providing, in its Rule 4-342(d) notice, some guidance as to what information it would be presenting at sentencing, the State chose to announce simply that it "reserve[d] the right to use any materials provided in discovery at the sentencing." At the hearing on the State's motion to compel discovery, defense counsel asked the State what it planned to use from among the more than 10,000 previously disclosed documents. The prosecutor replied, "we're going to use everything that we've provided, and we've provided things years ago[.]" Then, at the ensuing hearing on defense counsel's oral motion to compel compliance with Rule 4-342(d), the State steadfastly adhered to that position.

Rule 4-342(d) requires more specificity than that. Otherwise, the rule would have no purpose or effect in cases where the State presents voluminous information and documentation and then declines to specify what data, from that sea of material, it intends

13

to adduce at sentencing.  Certainly, it is not enough for the prosecutor to announce that the State intends to cull its sentencing presentation from a vast amount of previously disclosed discovery material.  Rather, it must identify, with some specificity, what previously disclosed documents and information it intends to rely upon at sentencing.  That is to say, it must provide enough detail that it reasonably informs the defense of what material and information the defense will face at sentencing.

Although the State violated Rule 4-342(d) by failing to provide Lopez with sufficient notice of the specific information that it intended to adduce at sentencing, we are not persuaded, for the reasons that follow, that Lopez was prejudiced by the State's inadequate notice.

**B.**

We turn now to address whether the circuit court's error, in failing to require the State to comply with Rule 4-342(d) and to provide the defense with adequate notice of what information it intended to rely upon at sentencing, was harmless.  As the *Dove* Court noted, if "an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced" the sentence imposed, "such error cannot be deemed 'harmless,'" *Dove*, 415 Md. at 743 (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)), and the sentence must be vacated and a new sentencing hearing held.  *Id.* at 752.

Nothing in the record before us indicates that Lopez suffered any prejudice as a result of the State's violation of Rule 4-342(d).  Although the State provided little guidance, if any, of which material, in the pool of 10,000 documents, it intended to use, at Lopez's

14

sentencing hearing, the prosecutor did state, at the hearing on Lopez's presentencing disclosure request, that the State intended, at sentencing, to "talk about the DNA" and "to show pictures, like we did at the plea [hearing]," from "the crime scene[s]" and "where he hid the baseball bat and where he went in North Carolina and covered up materials." Moreover, we note that the PSI report and victim impact statements, which the State repeatedly invoked at the sentencing hearing, were provided to defense counsel in sufficient time to prepare for that hearing.

Furthermore, notwithstanding defense counsel's vigorous presentence complaints that she could not tell, from the material she had been given, what the State planned to present at sentencing, defense counsel did not raise those objections at the sentencing hearing. In fact, she did not object at any point or to any part of the State's sentencing presentation on the ground that it contained information for which she was unprepared.

That silence belies Lopez's subsequent complaint, in both his application for leave to appeal and his appellate brief, that, "[o]n the day of sentencing, the State introduced wide-ranging evidence, much of which the Defense was hamstrung to rebut, due to lack of adequate notice." Specifically, in his brief, he asserts that "the State deprived the defense of the ability to intelligently utilize its limited investigative resources." Then, expounding upon that point, he states:

> What information would the State discuss in relation to Mr. Lopez' prior record, which dated back to his teenage years? What of his prison record and his long, complicated history with Ms. McQuain and her son? How much time should be spent investigating the reliability of the evidence of the present offenses, for example the State's allegation that Mr. Lopez was motivated by a desire to make money and to please

15

> a girlfriend? To be sure, all of this information was material to sentencing. The problem faced by defense counsel was narrowing down the field – finding the proverbial needle in the 10,000 pages of discovery that had already been turned over.

But, after making his "needle in 10,000 pages of discovery" complaint during the presentencing discovery proceedings, neither he nor his counsel ever mentioned or otherwise alluded to that objection at the sentencing hearing that followed. Indeed, if, at any point during the sentencing hearing, Lopez felt that the State's failure to provide more particularized presentencing information was crippling his response to the State's presentation, then he or his counsel should have informed the sentencing court of that problem. The court could have then considered his complaint and, if warranted, could have provided an appropriate remedy, such as postponement of the proceedings or exclusion of material or information at issue. In fact, Lopez's failure to object, at sentencing, to any information presented by the State presumably left the sentencing court under the impression that the State's flawed notice had ultimately proven not to be a problem for the defense.

Moreover, we reached a similar conclusion, under a comparable set of circumstances, in *Outmezguine v. State*, 97 Md. App. 151 (1993), *aff'd on other grounds*, 335 Md. 20 (1994). There, we found that the improper admission of previously undisclosed evidence, at a sentencing hearing, was harmless error, in no small measure, because, though defense counsel objected to "the late filing" of a victim impact statement — the State having provided that statement "just 20-25 minutes prior to the commencement of the

16

sentencing hearing" — he did not move for a postponement but, rather, stated that he would address the improperly admitted evidence "if I have to." *Id.* at 169.

Given defense counsel's failure to indicate, during sentencing, that he was not prepared to respond to any information adduced by the State, and the sentencing court's express reliance, in pronouncing sentences, on the uncontested brutality of the murders and Lopez's violent criminal history, we conclude that neither the State's violation of Rule 4-342(d), nor the sentencing court's denial of relief for that violation, warrants the resentencing sought by Lopez.

## II.

### Victim Impact Video

Lopez also contends that the sentencing court erred in permitting what he describes as "a 'music/video slide show' depicting the lives of the victims" to be played at the sentencing hearing. Its probative value, he claims, "was vastly outweighed by its capacity for unfair prejudice," and, consequently, its introduction violated both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. For the reasons that follow, we believe that the circuit court did not abuse its discretion in permitting the presentation, by the State, of the video in question, at sentencing.[6] Under an

---

[6] Although Lopez contends that his claim should be reviewed de novo, by this Court, and not, as the State contends, for abuse of discretion, we note that, in *Ball v. State*, 347 Md. 156 (1997), a capital case in which the defendant elected to have the court impose sentence, the Court of Appeals stated that, "[a]t a capital sentencing proceeding, the permissible scope of victim impact testimony . . . lies within the sound discretion of the

17

abuse-of-discretion standard, "this Court will not disturb the circuit court's ruling, unless it is well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable." *Patterson v. State*, 229 Md. App. 630, 639 (2016) (citations and quotations omitted).

The challenged video was an approximately six-minute montage of 115 still photographs, showing the two victims, Jane and William McQuain, throughout their lives, either alone, together, or with a family member or friend. The video began with a bell ringing. It was then initially accompanied by a piano instrumental piece and then by a pop song, as each photograph faded in and out. Finally, it concluded with the same sound of a ringing bell that signaled the commencement of the video.

There was, moreover, no oral or written narration in the video. In fact, the only words in the video were those comprising the video's title, "The Story of Jane and William," and the credits at the end of the video, listing individuals who provided photographs. Over Lopez's objection, Bill McQuain, the brother of Jane and uncle of

presiding judge, as limited by" the statute, then in effect (but since repealed by 2013 Md. Laws, ch. 156, § 3), governing the admissibility of evidence at capital sentencing proceedings. *Id.* at 197.

There is no reason why the same standard of review should not apply to non-capital sentencing proceedings. Given that less is at stake at a non-capital sentencing hearing than what is at stake at a capital sentencing hearing, it logically follows that the former should not be reviewed, pursuant to a stricter standard than the latter. Hence, we shall review the decision of the sentencing court for abuse of discretion, as the Court of Appeals did in *Ball*.

William, who served as the Victims' Representative, was permitted to show this video during his victim impact testimony.

**A.**

On appeal, Lopez suggests that presentation of the video at issue violated the Eighth Amendment, the constitutional prohibition against "cruel and unusual punishments," asserting that "the video raises the concern in [*Booth v. Maryland*, 482 U.S. 496 (1987),] that life without parole — the most severe penalty for committing a crime in Maryland — may be imposed arbitrarily and capriciously[.]"

In *Booth*, the Supreme Court held that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence" that does not "relate directly to the circumstances of the crime." *Id.* at 501-02, 507 n.10. But, four years later, in *Payne v. Tennessee*, *supra*, 501 U.S. 808, the Supreme Court expressly overruled *Booth*'s sweeping prohibition against the admission of such evidence, at a capital sentencing proceeding, "relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family," *Payne*, 501 U.S. at 817, declaring that "the *Booth* Court was wrong in stating that [victim impact] evidence leads to the arbitrary imposition of the death penalty," in violation of the Eighth Amendment. *Id.* at 825. While holding such evidence admissible, at such a sentencing hearing, the Court advised that, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally

19

unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.*

But, during the pendency of this appeal, the Supreme Court, in *Bosse v. Oklahoma*, 580 U.S. __, 137 S. Ct. 1 (2016) (per curiam), put to rest the impression that *Payne* was to be read as an unqualified rejection of *Booth*'s prohibition as to victim impact evidence. There, the Court explained that *Payne*'s holding was "limited to" a "particular type of victim impact testimony," *id.*, 137 S. Ct. at 2 (quoting *Payne*, 501 U.S. at 830 n.2), specifically, that which relates "to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne*, 501 U.S. at 817. "*Booth* also held," the *Bosse* Court further pointed out, "that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment[.]" *Bosse*, 137 S. Ct. at 2 (quoting *Payne*, 501 U.S. at 830 n.2). Then, in addressing why it had not made this clear in *Payne*, the Court explained that "no such evidence was presented in *Payne*, so [it] had no occasion to reconsider that aspect of the decision." *Id.* Consequently, *Booth*'s holding, that "the admission of a victim's family members' characterizations and opinions about the crime,

20

the defendant, and the appropriate sentence violates the Eighth Amendment," retains some

measure of constitutional vitality. *Id.*

The *Booth* Court, however, declined to address whether the Eighth Amendment

applies to the admission of victim impact evidence at a non-capital sentencing proceeding,

which is the issue presented by the instant case, by stating:

> **We note, however, that our decision today is guided by the fact death is a "punishment different from all other sanctions,"** see *Woodson v. North Carolina*, 428 U.S. 280, 303-304, 305 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.), and that therefore the considerations that inform the sentencing decision may be different from those that might be relevant to other liability or punishment determinations. . . . **We imply no opinion as to the use of these statements in non[-]capital cases.**

*Booth*, 482 U.S. at 509 n.12 (emphasis added).

But, even if the Eighth Amendment does apply to the admission of victim impact

evidence at a non-capital sentencing hearing, it would have no applicability to the

sentencing hearing in this case, because the victim impact video, at issue, did not violate

the strictures of *Booth*, which survived the *Payne* decision. That is to say, the video did

not contain the "victim's family members' characterizations and opinions about the crime,

the defendant, [or] the appropriate sentence." *Payne*, 501 U.S. at 830 n.2. We therefore

conclude that Lopez has adduced no grounds for relief under the Eighth Amendment.

**B.**

We begin our analysis of Lopez's principal constitutional claim, namely, that the

admission of the victim impact video at issue violated the Due Process Clause of the

Fourteenth Amendment, by noting that, as the Court of Appeals has observed, under

21

Maryland constitutional and statutory law, "trial judges *must* give appropriate consideration to the impact of the crime upon the victims[,]" and "[a]n important step towards accomplishing that task is to accept victim impact testimony wherever possible." *Cianos v. State*, 338 Md. 406, 413 (1995) (emphasis in original). *Accord Ball v. State*, 347 Md. 156, 195 (1997).

To be more precise, Article 47 of the Maryland Declaration of Rights provides that "[a] victim of crime shall be treated by agents of the State with dignity, respect, and sensitivity during all phases of the criminal justice process" and that victims are entitled, "upon request and if practicable, . . . to be heard at a criminal justice proceeding, as these rights are implemented . . . by law." Consistent with that constitutional mandate, victims of crime in Maryland are statutorily granted the opportunity to offer documentary and testimonial evidence at sentencing proceedings. *See*, *e.g.*, Md. Code (2001, 2008 Repl. Vol.), Criminal Procedure Article ("CP"), § 11-402(d) (providing that a sentencing court "shall consider the victim impact statement in determining the appropriate sentence"); CP § 11-403(b) (authorizing a sentencing court to take testimony, during a sentencing hearing, from the representative of a murder victim); Md. Code (1999, 2008 Repl. Vol.), Correctional Services Article ("CS"), § 6-112(c) (mandating that a presentence investigation report, in a case in which the State seeks a sentence of life imprisonment without the possibility of parole, include a victim impact statement as provided under CP § 11-402 and that the sentencing court "shall consider" that statement). *See also* Md. Rule 4-342 (e)(2) ("The right of a victim or a victim's representative to address the court

during a sentencing hearing under this Rule is governed by Code, Criminal Procedure Article, § 11-403.").

As the Court of Appeals has said, "[t]he impact of a crime on . . . the victim's family is both relevant and probative" at sentencing. *Ball*, 347 Md. at 198. *Accord Evans v. State*, 333 Md. 660, 687 (1994). Lopez claims, however, that "[a]ny probative value possessed by the evidence — a six-minute video montage of approximately 115 photographs of the victims set to music — was vastly outweighed by its capacity for unfair prejudice," and thus its admission at sentencing violated the Due Process Clause.

In holding that states may permit consideration of victim impact statements during capital sentencing proceedings, in *Payne v. Tennessee*, *supra*, 501 U.S. 808, the Supreme Court stated that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.* at 825 (quoting *Booth*, *supra*, 482 U.S. at 517 (White, J., dissenting)). Such "[v]ictim impact evidence," explained the Court, "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.*

In addition to the Eighth Amendment's prohibition against the admission, during a capital sentencing proceeding, "of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence," *Payne*, 501 U.S. at 830 n.2 (which, as we noted earlier in this opinion, is not relevant here), the Due Process

23

Clause, as the *Payne* Court noted, imposes some limitations on the admission of such evidence, during a capital sentencing proceeding. *Id.* at 825. Unfortunately, for our purposes, *Payne* did not articulate a specific test for determining when victim impact material violates due process. In fact, after noting that, "[i]n the majority of cases, . . . victim impact evidence serves entirely legitimate purposes," the only other guidance provided by the Court was the simple and unelaborated upon observation that, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.*

Since *Payne* was decided, the Supreme Court has not clarified the test that courts should apply in resolving a claim that "unduly prejudicial" victim impact evidence was admitted at a capital sentencing, a point made by Justice John Paul Stevens in his dissent from the denial of certiorari in *Kelly v. California*, 555 U.S. 1020 (2008), where he observed that, "[i]n the years since *Payne* was decided, [the Supreme] Court has left state and federal courts unguided in their efforts to police the hazy boundaries between permissible victim impact evidence and its impermissible, 'unduly prejudicial' forms." *Id.* at 1024 (Stevens, J., dissenting from the denial of certiorari). And, complicating the matter further, our nation's highest Court has said nothing whatsoever concerning due process limitations the federal Constitution imposes upon the states as to the admission of victim impact evidence in non-capital cases.

But we have not been left entirely adrift and without a constitutional compass. In a concurring opinion, in *Payne*, 501 U.S. at 830-33, Justice Sandra Day O'Connor suggested

24

that "unfairly prejudicial" victim impact evidence, whose admission, during a capital sentencing proceeding, would violate the Due Process Clause, is evidence that is "unduly inflammatory," *id.* at 831, which admittedly, at first blush, appears to be no more than a circumlocution. Payne was convicted of stabbing to death a twenty-eight-year-old mother, Charisse Christopher, and her two-year-old daughter, Lacie, and wounding, with the same knife, her three-year-old son, Nicholas. *Id.* at 811-13. The victim impact evidence at issue, there, was the testimony of Charisse Christopher's mother, Mary Zvolanek, who, in conveying to the sentencing jury the effect that Payne's crimes had had on her grandson, Nicholas, stated:

> "He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie."

*Id.* at 814-15.

Applying the "unduly inflammatory" standard to this victim impact evidence, Justice O'Connor opined that Ms. Zvolanek's "brief" testimony, although "mov[ing]," "did not inflame" the jury's "passions more than" did the gruesome facts of the crime itself, the ghastly nature of which the Justice described as follows: "Charisse Christopher was stabbed 41 times with a butcher knife and bled to death; her 2-year-old daughter Lacie was killed by repeated thrusts of that same knife; and 3-year-old Nicholas, despite stab wounds that penetrated completely through his body from front to back, survived—only to witness the brutal murders of his mother and baby sister." *Id.* at 832 (O'Connor, J., concurring).

25

The Court of Appeals subsequently applied this "unduly inflammatory" test to a claimed due process violation, based upon the admission of victim impact evidence, in a capital case, *Evans*, *supra*, 333 Md. at 688-89. After noting that the "standard for what is 'inflammatory' is not clearly defined in *Payne*," *id.* at 688, the Court of Appeals found that Evans had failed to meet that standard, because the victim impact evidence in question consisted of just a few words, uttered by the surviving sister of one of the two homicide victims, expressing guilt over her sister's death, as Evans apparently mistook her sister for her, in committing the murders for which he was hired: "The realization that my sister is dead because of me is a living nightmare that taunts me constantly." *Id.* at 689. Then, referring to her daughter, she added: "For a five-year-old to be put through this, I can only hope that time will help her forget." *Id.*

Echoing Justice O'Connor's words in her concurring opinion in *Payne*, the Court of Appeals avowed that the "brief statements" of the victim's sister did not "inflame[] the passion of the jury more than did the facts of the crime," which was, as the Court observed, a "carefully planned" murder-for-hire, in which Evans "patiently waited in the lobby of the hotel for his opportunity, calmly fired nineteen bullets with a MAC-11 machine pistol at [the victims], and used the proceeds of his crime to go shopping at a mall with his girlfriend later that evening." *Id.*

Then, in *Whittlesey v. State*, 340 Md. 30 (1995), the Court of Appeals reaffirmed its adoption of Justice O'Connor's "unduly inflammatory" test for a due process claim, based upon the admission of victim impact evidence, in a capital case, *id.* at 87 (citing *Evans*, 333 Md. at 689), but it did not have occasion to apply that test, because Whittlesey conceded,

26

in his brief, that there had been no due process violation in his case. *Id.* Although *Whittlesey* did not address a due process claim, it, nonetheless, merits our attention, as it is the only reported Maryland appellate decision to consider the use of an "in life" video, during a sentencing proceeding, as occurred in the instant case.

In *Whittlesey*, the Court of Appeals held that the trial court did not abuse its discretion in allowing the jury, during a capital sentencing hearing, to view a 90-second video clip of a teenage murder victim playing the piano, "a skill for which he had been nationally recognized." *Id.* at 86. Flatly rejecting Whittlesey's claim that the video presentation was unnecessarily cumulative of the testimony given by the victim's parents, the Court pointed out that the video was not merely cumulative, as it "illustrated [the boy's] piano skill better than any still photograph" and "portray[ed] his appearance at the time of his death," a portrayal which was otherwise unavailable, as the victim's body had decomposed by the time it had been found by police detectives. *Id.* at 87.

While our own appellate courts have not addressed the question of whether a montage of victim photographs, set to music and presented in video format, may be presented at sentencing, when the victim's identity is not in question and the defendant has raised a due process objection, another appellate court, the Idaho Court of Appeals, in *State v. Leon*, 132 P.3d 462 (Idaho Ct. App. 2006), has, under circumstances that parallel those presented by the case before us. And, in so doing, that appellate court upheld the admission of such information at sentencing for reasons we find persuasive.

27

In *Leon*, after the defendant entered an *Alford* plea to first-degree murder in exchange for the State's agreement not to seek the death penalty, the State sought to present, at sentencing, a

> four-and-one-half minute digital video disc (DVD) containing video and photographic images of [the victim] alone and with her children and other members of her family. The video portion of the DVD had contemporaneous audio recordings and the portion showing still photographs was arranged in a montage and set to music.

*Leon*, 132 P.3d at 464. Then, at the conclusion of the sentencing hearing, the trial court imposed a sentence of life imprisonment, whereupon Leon noted an appeal, contending that the sentencing court erred in admitting the victim impact video. *Id.*

In addressing "[w]hether a DVD presentation containing video and photographic images is a valid exercise of victim's rights," the Court of Appeals of Idaho began its analysis with the observation that the four-and-one-half minute video, at issue, "offered only a 'quick glimpse of the life petitioner chose to extinguish,'" as permitted under *Payne*. *Id.* at 465, 467 (quoting *Payne*, 501 U.S. at 830 (O'Connor, J., concurring)). Then, invoking the principle that "the sentencing judge is presumably able to ascertain the relevancy and reliability of the broad range of information and material which may be presented to it during the sentencing process and to disregard the irrelevant and unreliable[,]" the Idaho intermediate appellate court found that the victim impact video was not "so prejudicial or inflammatory in its design or content that its consideration by the sentencing court would result in "manifest injustice" and affirmed the life sentence imposed on Leon. *Id.* at 466-67 (citations and quotations omitted). In so ruling, the

28

appellate court pointed out that "[t]he DVD showed [the victim] interacting with her children and other family members and thus conveyed information relating to [her] personal characteristics and gave illustration to her mother's statements concerning the murder's impact upon [the victim's] family." *Id.* at 467. As for the single image of the victim's children at her grave, the court found that this image "could not have inflamed the court's passion more than did the facts of the crime." *Id.* (citing *Payne*, 501 U.S. at 832, 111 S. Ct. at 2612 (O'Connor, J., concurring)). Nor did the Idaho court find the accompanying music to be "unduly inflammatory." *Id.*

The six-minute video montage, at issue here, was only one-and-a-half minutes longer than the *Leon* video. It portrayed the harm inflicted by Lopez's double murders, using still photographs of the victims to offer, at most, a "quick glimpse" into the two lives extinguished by Lopez. *See Payne*, 501 U.S. at 830 (O'Connor, J., concurring). Neither the length of this victim impact video, which represents just three minutes for each victim, nor the content of the photographs, nor the music selections, created an undue risk that Lopez's consecutive sentences of life, without the possibility of parole, were the product of an inflammatory video. *See id.* at 825. Nor was there any indication but that the sentencing court, here, carefully considered the matter and determined that the video contained "just pictures," that it was relatively brief, and that the victims' family deserved its "one opportunity to show" the court, "or anyone else, the extent of the impact upon them."

Finally, the three out-of-state decisions that Lopez relies upon to support his claim that the admission of the victim impact video, at sentencing, violated his right to due

process — *Salazar v. State*, 90 S.W.3d 90 (Tex. Crim. App. 2002), *United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004), and *State v. Hess*, 23 A.3d 373 (N.J. 2011) — are either factually or procedurally distinguishable from the instant case, or simply unpersuasive, or both.

In *Salazar*, 90 S.W.3d 330, the Court of Criminal Appeals of Texas held that the sentencing court erred in admitting, during a non-capital jury sentencing proceeding, following Salazar's conviction for murder, "a seventeen-minute video montage of photographs . . . , set to music from the movie *Titanic*." *Id.* at 332. Describing the video as "lengthy, highly emotional, and barely probative of the victim's life at the time of his death," with background music that "greatly amplifie[d] the prejudicial effect of the original error," the Texas appellate court held that the probative value of the video was "substantially outweighed" by its risk of unfair prejudice. *Id.* at 337-39.

The instant case presents a quite different set of circumstances. To begin with, the six-minute video at issue, here, unlike the *Salazar* video, was neither "lengthy" nor "highly emotional," 90 S.W.3d at 338, and was, in contrast to the *Salazar* video, probative of the victims' lives. Nor did the background music of that video "amplif[y]" its "prejudicial effect," as occurred in *Salazar*. *Id.* at 339. Thus, unlike the *Salazar* video, the video challenged by Lopez was not "unduly inflammatory." *Evans*, *supra*, 333 Md. at 688.

Second, as noted earlier, the sentencing proceeding, in the instant case, took place before a judge, not, as in *Salazar*, before a jury, a significant distinction, as "[t]rial judges are presumed to know the law and to apply it properly." *Ball*, *supra*, 347 Md. at 206. Thus, we routinely trust judges presiding at bench trials to assess, in their gatekeeping role,

30

whether potentially unfairly prejudicial evidence should be admitted or excluded, and, if the evidence is unfairly prejudicial, that judge is not then required to recuse him or herself, as one presumes that a judge, unlike jurors, can put that evidence aside in making his or her decision. *See*, *e.g.*, *Williams v. Illinois*, 567 U.S. __, 132 S. Ct. 2221, 2235 (2012) (plurality opinion of Alito, J.) (observing that, in "bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions").

And, finally, unlike in *Salazar*, where the appellate court determined that the error in admitting the victim impact video was not harmless, *Salazar*, 90 S.W.3d at 337, nothing in the record before us suggests that the court below, in any way, relied upon the video, in imposing sentence. In fact, the court's statements, during sentencing, indicate that it was the brutal and heinous nature of the crimes committed by Lopez, as well as Lopez's history of recidivism, which led it to impose the sentences it did. Consequently, even if admission of the video constituted error, that error amounted to no more than harmless error. In sum, given the foregoing differences between *Salazar* and the instant case, *Salazar* is only helpful in that it highlights how relatively free of unfair prejudice and inflammatory effect the instant video was, in contrast to what was presented by the prosecution in *Salazar*.

We now turn to the second of the three cases, relied upon by Lopez, *United States v. Sampson*, *supra*, 335 F. Supp. 2d 166. In that capital case, the United States District Court for the District of Massachusetts held that a twenty-seven-minute-long video of the murder victim, "made for a memorial service" and containing "over 200 still photographs of the victim, in roughly chronological order, from the time he was born until the time just before his death," set to "evocative contemporary music," was inadmissible at sentencing.

31

*Id.* at 191. The federal district court reasoned that "its probative value was outweighed by the danger of unfair prejudice, and created a danger of provoking undue sympathy and a verdict based on passion as opposed to reason." *Id.*

The excluded video, in *Sampson*, has even less in common with the video at issue here, than the *Salazar* video, if for no other reason than its sheer length. The *Sampson* Court expressly noted that other courts, including the Maryland Court of Appeals, in *Whittlesey v. State*, *supra*, had admitted victim impact videos, during capital sentencing proceedings, but that, in all of those cases, the videos, at issue, were "brief and found to be probative of some aspect of the victim's life." *Sampson*, 335 F. Supp. 2d at 191. Although the Lopez video is longer than those admitted in the cases cited approvingly, in *Sampson* (the longest of those was approximately three minutes long), it is, nonetheless, far shorter and less likely to resemble a video "made for a memorial service" than the video excluded in *Sampson*. *Id.* Moreover, *Sampson*, like *Salazar*, but unlike the instant case, involved a sentencing proceeding before a jury. For the same reason *Salazar* is not helpful to our analysis, neither is *Sampson*, and, unlike in that case, where the court perceived "a danger of provoking undue sympathy and a verdict based on passion as opposed to reason," *Sampson*, 335 F. Supp. 2d at 191, no such danger was present here.

The third and final out-of-state authority, upon which Lopez relies, is *State v. Hess*, *supra*, 23 A.3d 373. Hess pleaded guilty to aggravated manslaughter, pursuant to a plea agreement, requiring her, among other things, to "acknowledge that she would receive a thirty-year prison sentence, subject to a parole disqualifier" of twenty-five and one-half years and that "neither she nor her attorney would seek a lesser term of imprisonment." *Id.*

32

at 376. She subsequently filed a post-conviction petition, alleging that her trial counsel was ineffective for failing to object to the State's introduction "of a video of the victim's life set to popular and religious music," as well as to "an invective-filled" victim impact statement made by a police officer who served with her deceased husband. *Id.*

Although concluding that trial counsel had failed to provide effective assistance for two reasons unrelated to the video in question and accordingly vacating Hess's sentence, the Supreme Court of New Jersey did find that the "professionally produced," seventeen-minutes-long victim impact video contained "childhood photographs and music likely to appeal solely to emotion and engender undue prejudice," as it included "photographs of the victim's childhood and his tombstone and a television segment covering his funeral" and was "scored to popular, holiday, country, religious, and military music." *Id.* at 393. The New Jersey appellate court stressed that, while the video's "music and the photographs of the victim's childhood and of his tombstone," as well as its "television segment about his funeral," failed to "project anything meaningful about the victim's life as it related to his family and others at the time of his death," it had "the great capacity to unduly arouse or inflame emotions." *Id.* at 393-94.

The seventeen-minute *Hess* video, like those in *Salazar* and *Sampson*, is much longer than the one at issue here, although we hasten to add that mere length of a victim impact video, alone, is not necessarily dispositive of its propensity for undue prejudice. But, at least as important, the *Hess* video, in contrast to the Lopez video, contained a depiction of the victim's tombstone and a "television segment about his funeral," both of which, undoubtedly, had the capacity to inflame rather than to inform. *Id.*

33

In sum, the videos at issue in *Salazar*, *Sampson*, and *Hess* presented a far greater risk of unduly and unfairly prejudicing the sentencing authority than the video at issue here. Accordingly, we find no abuse of discretion and affirm.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS ASSESSED TO APPELLANT.**

34